# IN THE SUPREME COURT OF TENNESSEE
# AT NASHVILLE
### October 5, 2016 Session


## STATE OF TENNESSEE v. JERRY LEWIS TUTTLE


### Appeal by Permission from the Court of Criminal Appeals
### Circuit Court for Maury County
### Nos. 21695, 22091      Stella L. Hargrove, Judge

_____


### No. M2014-00566-SC-R11-CD – Filed April 5, 2017
_____


We granted the State's appeal primarily to determine whether the intermediate appellate court erred in finding the search warrant affidavit insufficient to establish probable cause, and in doing so, to revisit the continuing vitality of State v. Jacumin, 778 S.W.2d 430 (Tenn. 1989). In Jacumin, this Court refused to follow Illinois v. Gates, 462 U.S. 213 (1983), which adopted a totality-of-the-circumstances analysis for determining whether an affidavit establishes probable cause for a search warrant, and instead embraced, as a matter of Tennessee constitutional law, another test derived from two earlier United States Supreme Court decisions, Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969). For the reasons explained herein, we overrule Jacumin and adopt the totality-of-the-circumstances analysis for determining whether an affidavit establishes probable cause for issuance of a warrant under article I, section 7 of the Tennessee Constitution. Applying this standard, we reverse the Court of Criminal Appeals' decision holding the search warrant invalid. We also reverse the intermediate appellate court's conclusion that the evidence was insufficient to support the defendant's convictions for conspiracy to possess over 300 pounds of marijuana with intent to sell or deliver and conspiracy to commit money laundering and reinstate the trial court's judgment approving the jury's verdict. Finally, we affirm, on separate grounds, the Court of Criminal Appeals' decision upholding the trial court's judgment ordering forfeiture of the $1,098,050 cash seized when the search warrant was executed.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
### Court of Criminal Appeals Affirmed in Part, Reversed in Part;
### Judgment of the Trial Court Reinstated

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE and HOLLY KIRBY, JJ., joined. ROGER A. PAGE, J., Not Participating.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Andrew Craig Coulam, Assistant Attorney General; Brent Cooper, Assistant District Attorney General; T. Michel Bottoms, District Attorney General, for the appellant, State of Tennessee.

John S. Colley III (at trial and on appeal) and Kevin S. Latta (at trial), Columbia, Tennessee, for the appellee, Jerry Lewis Tuttle.

**OPINION**

**I. Factual and Procedural Overview**

In 2012, the Maury County Grand Jury returned two separate indictments charging the defendant, Jerry Lewis Tuttle, with multiple offenses in connection with a drug trafficking conspiracy. The indictments were issued after officers executed a search warrant on April 24, 2012, for property located at 4571 Dugger Road, Culleoka, Tennessee, in Maury County ("4571 Dugger Road property").[1] The property consisted of "5.77 acres," and the defendant resided in a mobile home on the property with his wife, Tammy A. Tuttle, who was the record owner of the property.[2] The warrant authorized officers to search the defendant's "single wide mobile home gray in color with an attached wood constructed covered front po[]rch" and "all outbuildings, outhouses and storage buildings, and all vehicles found thereon." Officers were authorized to seize "[m]arijuana, all equipment, devices, records, computers and computer storage discs . . . used for the purpose of producing, packaging, dispensing, delivering or obtaining

---

[1] The defendant's wife and adult son were also charged with criminal offenses after the search of the 4571 Dugger Road property and other locations, but this appeal involves only the defendant.

[2] The State has not challenged the defendant's standing to contest the search on the ground that he was not listed as the record owner of the 4571 Dugger Road property, nor has the defendant contested his connection to the property.

controlled substances, or recording transactions involving controlled substances, [and] any indicia of ownership, dominion, or control over the premises to be searched . . . ."

When the warrant was executed, officers found, inside the residence, eight pounds of marijuana, almost a half an ounce of cocaine, and between $95,000 and $98,000 cash, in $100 and $50 bills, as well as multiple guns, a large scale capable of weighing items up to thirteen pounds, a small scale capable of weighing items up to two pounds, a money counter, a device used to grind marijuana into a powder, and a pipe and other items associated with smoking marijuana. Just outside the residence in the trunk of the defendant's Honda Civic, officers located a number of additional guns and an ammunition can containing $1,000,300 cash, all in $100 bills that were issued prior to the year 2000. Officers also located marijuana plants growing in an Igloo cooler and various items of personal property, including vehicles and farming equipment, believed to be derived from the defendant's involvement in drug trafficking.

The defendant moved pre-trial to suppress the evidence seized during the search, arguing that the affidavit supporting the search warrant failed to establish probable cause and contained false information. The defendant also moved to dismiss the forfeiture count of the indictment, arguing that the forfeiture was barred by the five-year statute of limitations and by the State's failure to comply with the forfeiture statute. After a hearing on March 19, 2013, the trial court denied the motions.

The case proceeded to trial, and the jury found the defendant guilty of the following six offenses: (1) simple possession of cocaine in an amount of over .5 grams; (2) possession of marijuana in an amount of not less than one-half ounce nor more than ten pounds with intent to sell; (3) conspiracy to possess over 300 pounds of marijuana with intent to sell or deliver; (4) conspiracy to commit money laundering; (5) money laundering; and (6) unlawful possession of a firearm with intent to go armed during the commission of or attempt to commit a dangerous felony.[3] The day after the jury rendered its verdict, the trial court held a hearing on the forfeiture count of the

---

[3] After a separate sentencing hearing, the trial court imposed an effective fifty-year sentence, with a release eligibility of thirty-five percent. Neither party has raised any issue related to sentencing in this appeal.

indictment, Tenn. Code Ann. § 39-11-708(d) (2010), and ordered forfeiture of the cash and other personal property found during the search.[4]

The defendant appealed, challenging the trial court's ruling on his motion to suppress, the sufficiency of the evidence to support his conspiracy convictions, and the trial court's decision ordering forfeiture of the cash. A majority of the Court of Criminal Appeals reversed the trial court's ruling on the defendant's motion to suppress and vacated the defendant's conspiracy convictions for insufficient evidence but affirmed the trial court's decision ordering forfeiture of the cash.[5] We granted the State's application for permission to appeal.

Because the issues before us involve facts presented in the affidavit and evidence introduced at separate hearings, we will separately summarize the facts and analyze the law related to each of the following issues: (1) whether the search warrant affidavit sufficiently established probable cause for issuance of the warrant; (2) whether the evidence presented at trial was sufficient to support the defendant's conspiracy convictions; and (3) whether, given the proof offered at trial and at the post-trial forfeiture hearing, the courts below properly ordered forfeiture of the cash seized on the 4571 Dugger Road property.

## II. Search Warrant Affidavit

### A. *Facts Recited in the Search Warrant Affidavit*

Trooper Shawn Boyd, a Tennessee Highway Patrol ("THP") officer, prepared the April 23, 2012 affidavit that resulted in the issuance of the April 24, 2012 search warrant allowing officers to search the 4571 Dugger Road property.[6] When he prepared the

---

[4] Only the forfeiture of the cash is at issue in this appeal.

[5] Judge Roger A. Page, who now serves as a member of this Court, dissented from the majority's decision to reverse the trial court's ruling on the motion to suppress and to reverse the defendant's convictions but concurred with the majority's forfeiture decision.

[6] Trooper Boyd used this affidavit to obtain search warrants for other properties as well, but this appeal involves only the search of the property at 4571 Dugger Road.

affidavit, Trooper Boyd had worked as a THP officer for ten years and had been assigned to the Nashville Drug Enforcement Agency Task Force ("Nashville DEA") for two years.

The investigation culminating in the request for this warrant began after another THP officer stopped a motorist, Adrian Davis, on March 2, 2012, for a routine traffic violation. When a consensual search of Mr. Davis's vehicle yielded a small amount of marijuana and Lortab pills, Mr. Davis offered to provide law enforcement with information concerning a marijuana trafficking organization. The THP officer issued Mr. Davis a citation for possession of drugs, released him, and gave him Trooper Boyd's telephone number. Mr. Davis called Trooper Boyd the next day, and two days after that, March 5, 2012, Trooper Boyd interviewed Mr. Davis.

During this interview, Mr. Davis admitted to Trooper Boyd that he had previously received marijuana from an Atlanta, Georgia based marijuana distribution organization operated by a Hispanic man named Martinez. Mr. Davis stated that the defendant's son, Christopher Tuttle ("Son"), known to Mr. Davis as "Red," received large quantities of marijuana—approximately 600 to 700 pounds—from this same drug trafficking organization ("DTO") on a weekly basis. When shown the photograph from Son's driver's license, Mr. Davis identified Son, stated that he had seen Son picking up marijuana from couriers of the DTO about a year earlier, stated that Son drove a white Nissan truck and lived in South Nashville (although Mr. Davis did not know the exact location), and, relevant to the case, stated that Son's "whole family [was] involved with selling drugs." Mr. Davis also provided Trooper Boyd with his own telephone number and with two addresses at which he resided.

Using this information, Nashville DEA learned that Mr. Davis's telephone number was connected to ongoing DEA investigations in Atlanta, Georgia, and Birmingham, Alabama, into marijuana distribution organizations. Atlanta DEA already had a wiretap on Mr. Davis's phone number, and, on January 14 and 15, 2012, intercepted Mr. Davis "discussing multi[-]hundred pound marijuana deals" with the target of its investigation. Birmingham DEA had tracked a suspected drug dealer, Cleto Medina, the target of its investigation, to one of the addresses Mr. Davis gave Trooper Boyd as his residence and had information, via wiretap, that another suspect, known as "The Red," was "believed to be receiving large shipments of marijuana in Tennessee." Birmingham DEA had received this information from Austin, Texas DEA, which was conducting a wiretap as part of an investigation it was conducting of a marijuana trafficking organization based in Texas.

In March 2012, Austin DEA informed Nashville DEA of its investigation of the Mario Martinez Calderon DTO, which was receiving, transporting, and distributing kilograms of cocaine, methamphetamine, and marijuana from Austin, Texas to Birmingham, Alabama. Austin DEA advised that Mr. Medina had been identified as the person in Birmingham to whom the Martinez-Calderon DTO supplied drugs.

Furthermore, Austin DEA advised that, on March 6, 2012, one of its confidential informants made a controlled call to Mr. Medina and learned that he had a Tennessee customer known as "El Rojo," which translates to "The Red." Mr. Medina and the confidential informant discussed the price of cocaine and possible future deals with "El Rojo" and another Tennessee customer involving multiple kilograms of cocaine. Mr. Medina stated that "he ha[d] known 'El Rojo' for a while and that 'El Rojo' is very careful."

On March 16, 2012, Birmingham DEA advised Nashville DEA that Mr. Medina had received a shipment of drugs in Birmingham and that Mr. Medina's brother and co-conspirator, Biato Jaramillo, would be transporting drugs to a customer in Tennessee that day. At approximately 5:30 a.m. that day, Birmingham DEA advised Nashville DEA that their agents were following a maroon Ford Expedition with an Alabama license tag north on Interstate 65 toward Tennessee and that the Expedition was transporting a large amount of narcotics. Nashville DEA responded by sending officers to conduct surveillance of the vehicle once it crossed into Tennessee. Birmingham DEA agents followed the vehicle until it crossed into Tennessee at approximately 7:56 a.m., at which point Nashville DEA began following the vehicle as it continued north on Interstate 65. At approximately 8:26 a.m., officers observed the Expedition take exit 37 onto Tennessee State Highway 50 and stop at a Shell gas station near the exit. The Expedition pulled next to a gas pump, and the driver went into the store, returned to the vehicle, drove the vehicle to a parking space, and stopped.

About thirty minutes later, at approximately 8:58 a.m., an officer observed a white Nissan Titan truck, later identified as belonging to Son, arrive at the gas station, pull next to the gas pumps, and then leave the gas station, followed by the maroon Expedition. Officers followed the vehicles as they traveled west on Highway 50 and then turned onto Highway 373 at about 9:09 a.m. However, when the vehicles turned onto Mooresville Pike a short time later, officers were unable to maintain surveillance in the rural area without risking discovery, so "contact with the vehicles was lost for a period of time." During this time, officers learned from searching a computer database containing real estate records that Son possibly had family in the area, because Tammy A. Tuttle was listed as the record owner of property located nearby at 4571 Dugger Road, Culleoka, Tennessee.

Trooper Boyd and another officer then drove past the 4571 Dugger Road property and observed Son's white Nissan Titan truck parked in the driveway behind the defendant's mobile home. A short time later, officers observed Son's vehicle pull onto Highway 373, drive to Highway 50, and then pull onto Interstate 65, heading north toward Nashville.

Based on the foregoing, Trooper Boyd expressed his belief "that during this meeting [on March 16, 2012] BIATO JARAMILLO transferred drugs to [Son]" at the 4571 Dugger Road property. Trooper Boyd acknowledged that officers had no information implicating Tammy A. Tuttle in Son's drug trafficking activities, but, as Trooper Boyd recited in the affidavit, officers were aware that Son's father had previously resided on the property and that Son had previously hidden proceeds of an earlier drug trafficking scheme on the 4571 Dugger Road property. In particular, Trooper Boyd explained that, on December 14, 2000, a Davidson County Grand Jury had charged Son and other co-conspirators in a multi-count indictment for their involvement in a marijuana distribution organization Son operated. The charges stemmed from separate February 2000 traffic stops of Son and his wife, which resulted in the seizure of over $60,000 cash derived from drug proceeds, a July 2000 seizure of 2,600 pounds of marijuana from a rental truck that another co-conspirator intended to deliver to Son, an August 2000 seizure of 2,200 pounds of marijuana from a vehicle in Son's possession, and $25,000 cash Son had retrieved from another co-conspirator's residence to pay the driver of the loaded vehicle. As part of this investigation, a search warrant was executed on August 11, 2000, at the 4571 Dugger Road property, and officers "located a metal ammo can, which contained a plastic bag with $112,000[] in U.S. currency. The plastic bag had '$200,000' and the initials 'CT' written on it."[7] Investigators suspected that the cash constituted Son's proceeds from drug trafficking activities, which Son had hidden at his father's residence.

Trooper Boyd recounted that, on the morning of April 2, 2012, Birmingham DEA observed suitcases being offloaded from a bus and loaded into Mr. Medina's white Lincoln Navigator in Birmingham. Around noon that same day, Birmingham DEA informed Trooper Boyd of a call it had intercepted between Mr. Medina and Son, during which Mr. Medina asked if Son was ready, and Son answered in the affirmative. Mr. Medina told Son he would leave at 1:30 p.m. and would arrive around 4:30 p.m. Son agreed to this time and told Mr. Medina to call when he was near the state line. Mr. Medina and Son discussed "luggage," with Mr. Medina saying it was just one big luggage and the amount was 170. Referring to what Trooper Boyd believed was money to pay for the drugs, Son told Mr. Medina that he did not have all of it but was very close

_____

[7] As a result of the 2000 search, the defendant was also charged with criminal offenses, and pled guilty on April 9, 2002, to conspiracy to sell over seventy pounds of marijuana and to one count of money laundering as the result of his assistance in the concealment of Son's drug proceeds. He received an eight-year sentence for each offense.

and was going to another location to find out if he could get all of it. Based on his training and experience, Trooper Boyd believed that "luggage" referred to marijuana and "170" referred to the cost of the marijuana as $170,000. Trooper Boyd interpreted the coded language in the phone call as Son and Mr. Medina "making plans in order to conduct a marijuana transaction."

At 3:30 p.m. that same day, April 2, 2012, Birmingham DEA contacted Trooper Boyd and advised that, during an intercepted call, Son had instructed Mr. Medina to take exit 32 off Interstate 65, turn left, and proceed to a Texaco gas station. Mr. Medina had repeated the instructions and agreed to call Son when he exited the Interstate. Acting on this information, Nashville DEA established surveillance of Highway 373, known as the Culleoka Highway, at exit 32 in the direction Son told Mr. Medina to travel. Officers also set up surveillance at a market located at 2345 Culleoka Highway. At approximately 4:00 p.m., officers observed the white Navigator leave Interstate 65 at exit 32 and proceed west on Highway 373, as Son had instructed. At approximately 4:07 p.m., another officer observed Son arrive at a nearby gas station in his white Nissan Titan truck and pull next to the gas pumps. Shortly after Son arrived, the Navigator, driven by a Hispanic male wearing blue jeans, a striped shirt, and a ball cap, stopped next to the gas pumps. Officers observed the Hispanic man and Son leave their vehicles and walk towards the front of the market. Both men soon returned to their vehicles and departed the gas station, with the Navigator following the Son's vehicle as it turned onto Mooresville Pike in the direction of Dugger Road. Because of the rural location, officers were again unable to follow the vehicles after they turned without risking discovery.

However, at 4:20 p.m., Birmingham DEA Special Agent Shawn Steven advised Officer Boyd that Birmingham DEA had received "a cell phone GPS [global positioning system] location of [Mr. Medina's] phone and [that] it placed [Mr. Medina] on Dugger Road in Culleoka." In his affidavit, Trooper Boyd stated that Son "was found at this same location during the surveillance that took place on March 16, 2012."

The next day, April 3, 2012, a federal magistrate judge authorized the GPS tracking of Son's telephone number, and GPS tracking that same day placed Son on Remuda Circle in Smyrna, Tennessee. Trooper Boyd traveled to Remuda Circle and observed Son's white Nissan Titan truck in the driveway.

On April 4, 2012, Trooper Boyd returned to Remuda Circle at approximately 12:46 p.m., because GPS had placed Son's telephone there, but the white Nissan Titan truck was not at the residence. At approximately 1:30 p.m., Trooper Boyd observed the vehicle pull into the driveway and saw a white female exit the vehicle and enter the residence via the garage. Ten minutes later, Trooper Boyd saw the white female and Son exit the residence and enter the vehicle, with the female driving and Son in the passenger seat. About two hours later, the vehicle returned to Remuda Circle and backed into the

garage. Trooper Boyd observed Son exit from the driver's side and a teenage male exit from the passenger side. Both entered the residence via the garage.

The next day, April 5, 2012, Trooper Boyd obtained an order from a Tennessee trial judge to intercept and monitor calls to a phone number Son used. On April 11, 2012, Trooper Boyd intercepted a call between Mr. Medina and Son, in which Son indicated that the "wood" was "157" instead of "170." Mr. Medina assured Son that he and his boss would give Son credit for the difference, and Son indicated that he should receive credit for the difference between 157 and "170," as well as "three" from another time.

Based on his experience and training, Trooper Boyd interpreted "wood" as referring to "marijuana" and believed that Son was telling Mr. Medina he had paid for 170 pounds of marijuana but had received only 157 pounds and that Mr. Medina's response was assuring Son that he and his boss would credit Son for the shortages on the next delivery. Trooper Boyd stated that during this conversation with Mr. Medina—and thirty minutes before and after it—GPS tracking had placed Son's phone on Remuda Circle in Smyrna. Trooper Boyd believed that, when this conversation occurred, Son had "just finished weighing the marijuana received from the delivery on April 2, 2012."

Based on the above facts, Trooper Boyd stated in his affidavit his conclusion that Son was "utilizing 4571 Dugger Road, Culleoka, Tennessee to further his drug trafficking activities." Trooper Boyd based this conclusion "specifically on intercepted calls and surveillance of [Son] that establish that [Son] utilized 4571 Dugger Road, Culleoka, Tennessee on March 16, 2012 and April 2, 2012 to receive shipments of marijuana in excess of 100 pounds from BIATO JARAMILLO AND CLETO MEDINA." In paragraph eighteen of the fifty-two-paragraph affidavit, Trooper Boyd stated: "As further described below [Son] used this residence on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in excess of 100 pounds." However, nowhere in the affidavit did Trooper Boyd state that he, or any other law enforcement officer, had actually witnessed the offloading of drugs or Son receiving drugs at the 4571 Dugger Road property.

Trooper Boyd also based his conclusion that evidence of drug trafficking would be found on the 4571 Dugger Road property on his own experience and training, gained from executing numerous search warrants in drug trafficking investigations and attending numerous training workshops and seminars, taught by both the DEA and private organizations. From this experience and training, Trooper Boyd had learned several "habits, characteristics, and practices of drug traffickers," including, among others, the following:

    a.    Drug traffickers very often place their assets derived from their criminal activities in names of other persons or corporate entities other than their own names, or they will use false names and identities in order to

avoid detection of these assets by law enforcement agencies so as to avoid forfeiture of the same.

b.      Drug dealers actually own and continue to use such assets derived from criminal activities and exercise dominion and control over this property, though it may be titled or recorded in the names of others.

c.      Drug dealers who purchase larger amounts of controlled substances must maintain and have access to large amounts of cash in order to maintain and finance their on-going narcotics business.

. . . .

e.      Drug dealers very often will hide contraband, proceeds of drug sales and records of drug transactions in secure location[s] such as their own residences, locations which they control but which are titled in the names of others, residences of others who are participants in or aiders and abettors of the drug conspiracy, their businesses, and bank safe deposit boxes to conceal them from law enforcement officials.

. . . .

### B.  Suppression Hearing

At the pretrial suppression hearing, the defendant argued that the affidavit failed to establish probable cause because it lacked sufficient facts to establish a nexus between the drugs and the defendant's residence on the 4571 Dugger Road property. The defendant insisted that the allegations of the affidavit actually indicated that the drugs were located at Son's Smyrna Remuda Circle residence. Furthermore, the defendant alleged that the facts aimed at establishing a nexus between the drugs and his residence on the 4571 Dugger Road property were stale, consisting only of the defendant's ten-year-old charges and convictions (including the search of the property preceding them) and Trooper Boyd's statement that, on two prior occasions, the most recent being three weeks before officers applied for the warrant, Son had allegedly used the property to receive shipments of drugs from agents of the DTO.

In addition to challenging the facial sufficiency of the affidavit, the defendant attempted to impeach the affidavit by arguing that paragraphs eighteen and thirty-seven of the affidavit contained false information. In particular, the defendant claimed that paragraph eighteen falsely implied that Trooper Boyd, or another officer, had witnessed the offloading of marijuana in excess of 100 pounds at the defendant's "residence" on March 16 and April 2. The defendant pointed to the following statement in paragraph eighteen as supporting this claim: "As further described below [Son] used this *residence*

- 10 -

on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in excess of 100 pounds." (Emphasis added.) The defendant also attacked the following portion of paragraph thirty-seven as false:

> At approximately 4:20 p.m. [Birmingham DEA Special Agent Shawn Steven] advised me [Trooper Boyd] that they received a cell phone GPS location of [Mr. Medina's] phone and it placed him on Dugger Road in Culleoka, Tennessee. [Special Agent] Steven was able to provide the numeric for that GPS query, they are as follows: 35.47379, -87.02369, the GPS location placed [Mr. Medina] on Dugger Road at 4:24 p.m. on April 2, 2012. As described earlier in this affidavit [Son] was found at this same location during the surveillance that took place on March 16, 2012. Also as described earlier in this affidavit the 20th Judicial Drug Task Force executed a search warrant at 4571 Dugger Road, Culleoka, TN in connection with their investigation in 2000. During the search $112,000.00 in cash was seized from the residence which at the time belonged to [Son's] father.

According to the defendant, this statement falsely implied that the GPS coordinates placed Mr. Medina in the driveway of the defendant's mobile home, which was the "location" at which Son's vehicle was seen parked on March 16, 2012.

To substantiate his assertion that paragraph thirty-seven contained false information, the defendant called Ben Sellers to testify at the suppression hearing. Mr. Sellers owned C.T.S., a company specializing in providing equipment to business clients which allows them to track the GPS whereabouts of their vehicles. Mr. Sellers said his company's equipment is accurate to within five meters. Using his company's equipment and his cell phone, Mr. Sellers visited the GPS coordinates listed in paragraph thirty-seven of the affidavit. He testified that these coordinates referred to a specific point on an unmarked dirt road, approximately 120 to 140 yards from the defendant's residence on the 4571 Dugger Road property but only fifty feet from a neighbor's house located at 4585 Dugger Road. Mr. Sellers acknowledged, however, that the property to which the GPS coordinates referred was included in the nearly six-acre tract constituting the 4571 Dugger Road property, for which the search warrant was issued.

Nevertheless, Mr. Sellers stated that the driveway of the defendant's residence, where officers saw Son's truck parked on March 16th, would have different GPS coordinates than those listed in paragraph thirty-seven. But, Mr. Sellers conceded that, when the GPS coordinates listed in paragraph thirty-seven were typed into Google Maps, an internet service, Google Maps returned the location of the coordinates as 4571 Dugger Road, the address associated with the defendant's residence and the property for which the search warrant was issued.

Trooper Boyd also testified at the suppression hearing. He clarified that, while he had stated in paragraph thirty-seven that the GPS coordinates "placed [Mr. Medina] on Dugger Road . . . [and as] described earlier in this affidavit[,] [Son] was found at this same location . . . on March 16, 2012," he had not meant "that it was at the exact same location that [Son's] truck was parked . . . . It was in the same area there, . . . [the] same location that he was seen at on March 16th." Trooper Boyd acknowledged that the wording of the paragraph could have been more precise, could have specified that law enforcement officers had observed Son's truck parked in the driveway of the defendant's residence only after the suspected drug transfer had occurred, and could have provided a fuller explanation of the GPS coordinates. Trooper Boyd explained that he had failed to be more precise because he was "just tired." Trooper Boyd reiterated that Google had returned the location of the GPS coordinates listed in paragraph thirty-seven as 4571 Dugger Road.

Trooper Boyd confirmed that neither he nor any other agent witnessed a drug transaction or transfer at the 4571 Dugger Road property. He described his use of the word "residence" in paragraph eighteen as "probably miswording, more than anything" and emphasized that the statement reflected his belief, based on the available evidence, not his first hand observation, that Son was using the property to transfer drugs. He agreed that he should have used the more general word "property" instead of "residence." Nevertheless, Trooper Boyd maintained that he had neither intentionally included false information in the affidavit nor attempted to mislead the judge into issuing the warrant.

DEA Special Agent Shawn Steven also testified at the suppression hearing. He explained that, after learning from Trooper Boyd that officers were not able to maintain surveillance on Son and Mr. Medina for fear of being discovered, he had asked Sprint, pursuant to a warrant, to ping Mr. Medina's cell phone. Upon his request, Sprint sent a signal—a ping—to Mr. Medina's cell phone, which returned the latitude and longitude coordinates of the phone's location at the moment it was pinged. DEA Special Agent Steven explained that the accuracy of pinged locations varies from five meters to 1,000 meters. Sprint informed Special Agent Steven that the pinged location of Mr. Medina's phone was accurate to within forty-one meters or 123 feet. Special Agent Steven understood that the coordinates referred to a location on Dugger Road and that both the defendant's property and a neighbor's property were within the forty-one-meter accuracy range, but that neither the exact coordinates nor the forty-one-meter accuracy range included the defendant's mobile home and driveway. Special Agent Steven shared the

GPS information with Trooper Boyd, who included the coordinates in his affidavit. Special Agent Steven acknowledged that it would be false to state that the ping of Mr. Medina's phone on April 2, 2012, occurred at exactly the same location where Son's truck was parked on March 16, 2012, because they were two different locations.

Lieutenant William Doelle[8] of the Maury County Sheriff's Department, who was present on April 24, 2012, when the search warrant was executed, also testified at the suppression hearing. He stated that the 4571 Dugger Road property consisted of approximately six acres and that the defendant's residence was situated near the road and a dirt path that ran along the back of the property. He confirmed that the GPS coordinates for Mr. Medina's phone were located on the 4571 Dugger Road property, although the coordinates did not refer to the defendant's residence. Lieutenant Doelle stated that the defendant's residence was not visible from the location of the GPS coordinates.

After considering the testimony presented at the suppression hearing, the trial court denied the motion to suppress. The trial court concluded that paragraph thirty-seven did not contain false information. Given the range of accuracy of the GPS coordinates and the proof showing that Google had returned the location of the GPS coordinates as 4571 Dugger Road, the trial court "[was] inclined to grant some leniency relative to the [GPS] location of [the] [d]efendant's residence, and [found] that the [a]ffidavit otherwise describe[d] with sufficient particularity the location of the residence and the property to be searched." As for paragraph eighteen, however, the trial court found that the statement, "[a]s further described below [Son] used [the defendant's] residence . . . on March 16, 2012[,] and April 2, 2012[,] to off[-]load shipments of marijuana in excess of 100 pounds," was "false." The trial court explained:

> Affiant, Trooper Shawn Boyd, . . . testified as follows: "I saw [Son's] . . . truck only on March 16, 2012[,] in the driveway of the trailer—pulled in behind the trailer." Therefore, on that day only, March 16, 2012, he merely saw [Son's] truck pulled in behind the trailer on [the defendant's] property. The [a]ffidavit stated that further information would be included as to criminal activity [that] occurred on April 2, 2012[,] and March 16, 2012.

---

[8] Lieutenant Doelle's surname is not spelled consistently in the record on appeal; however, this opinion uses the spelling that appears in the affidavit submitted in support of the forfeiture warrant, which Lieutenant Doelle signed.

There is nothing else in the [a]ffidavit relative to these dates and specific criminal activity actually observed on [the defendant's] property. Trooper Boyd testified that this was a "simple mistake." There is nothing in the [a]ffidavit and there is no testimony of any marijuana or other narcotics being delivered, loaded[,] or off-loaded at [the defendant's address].

Nevertheless, the trial court concluded that the false statement had not been made "with intent to deceive the [c]ourt" and, while important, the trial court could not "say it [was] a false statement 'essential to the establishment of probable cause, recklessly made.'" The trial court considered the "other facts and statements" in the affidavit, "including what else happened on March 16, 2012 and April 2, 2012," and concluded that the affidavit had sufficiently established "a nexus between the criminal activity and [the defendant's] property," and that the affidavit sufficiently established probable cause. The trial court explained:

> the specifics of the intercepted phone calls and information from wire taps from Texas to Alabama to Tennessee, and information received from the investigation of a drug trafficking operation based in Texas, involving [Son]; the surveillance of [Mr.] Medina and [Mr.] Biato traveling from Alabama to Tennessee and then to Columbia, exiting at 373 (Culleoka Highway), then meeting up with [Son]; the [a]ffiant's statement that he drove by [the defendant's] residence and located [Son's] Nissan Titan there on the morning of March 16, 2012, after surveillance was unable to be maintained, then observed [Son] pull onto Highway 373, then Highway 50 and onto I-65; the GPS ping of [Mr.] Medina's phone on April 2, 2012, placing him on Dugger Road; the fact that [a]ffiant was familiar with the exact location of [the defendant's] residence through the 2000 investigation; and the fact that the exact location of [the defendant's] residence is correctly described with great particularity, despite the wrong GPS numerics.

As a result of these findings, the trial court denied the motion to suppress.

A majority of the Court of Criminal Appeals reversed and concluded that the search warrant affidavit failed to establish a sufficient nexus between the defendant's residence and criminal activity, failed to establish the basis of knowledge and credibility of the information provided by Mr. Davis, an informant from the criminal milieu, and contained recklessly made false statements essential to establishing probable cause. State v. Tuttle, No. M2014-00566-CCA-R3-CD, 2015 WL 5251990, at *1 (Tenn. Crim. App. Sept. 8, 2015).

## C. Analysis

### 1. Standards of Review

Familiar standards govern our review of suppression issues. We uphold the trial court's findings of fact, unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014) (citing State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from [the] evidence." Bell, 429 S.W.3d at 529 (citing State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); Day, 263 S.W.3d at 900; Odom, 928 S.W.2d at 23)). The application of law to facts is reviewed de novo, and the appellate court is not obliged to afford a presumption of correctness to the lower court's conclusions of law. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

An appellate court considering whether probable cause supported issuance of a search warrant, "may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." State v. Henning, 975 S.W.2d 290, 295 (Tenn. 1998); see also Jacumin, 778 S.W.2d at 432. The reviewing court's standard is whether the evidence viewed as a whole provided the magistrate with "a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." Jacumin, 778 S.W.2d at 432 (citing Gates, 462 U.S. at 236; Spinelli, 393 U.S. at 419).

### 2. Probable Cause and the Preference for Warrants

Under the Fourth Amendment to the United States Constitution[9] and article I, section 7 of the Tennessee Constitution[10] search warrants may not be issued unless a

---

[9] The Fourth Amendment, which applies to the States through the Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643, 655 (1961), provides:

neutral and detached magistrate determines that probable cause exists for their issuance. Gates, 462 U.S. at 240; Henning, 975 S.W.2d at 294; Jacumin, 778 S.W.2d at 431. "'Articulating precisely what probable cause means is not possible.'" State v. Reynolds, 504 S.W.3d 283, 300 (Tenn. 2016) (quoting Ornelas v. United States, 517 U.S. 690, 695 1996) (quotation marks and alterations omitted)). "Probable cause is more than a mere suspicion but less than absolute certainty." Id. (internal citations and quotation marks omitted). "[T]he strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." State v. Bishop, 431 S.W.3d 22, 41 (Tenn. 2014); see also Brinegar v. United States, 338 U.S. 160, 174 (1949) (discussing the differences between the probable cause standard and the standard for proving guilt beyond a reasonable doubt). Probable cause, as its name implies, deals with probabilities. Brinegar, 338 U.S. at 175; Jacumin, 778 S.W.2d at 432. "These [probabilities] are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar, 338 U.S. at 175; see also Reynolds, 504 S.W.3d at 300 (recognizing that the probable cause standard is practical and nontechnical).

"Determinations of probable cause are extremely fact-dependent." Bell, 429 S.W.3d at 534-35 (citing Ker v. California, 374 U.S. 23, 33 (1963)). Reviewing courts afford "great deference" to a magistrate's determination that probable cause exists.

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[10] Article I, section 7 provides:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. art. I, § 7.

Jacumin, 778 S.W.2d at 431-32; see also State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009) (reiterating that appellate courts should afford deference to a magistrate's determination). "[I]n a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. 102, 106 (1965).

> The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Ventresca, 380 U.S. at 106 (quoting Johnson v. United States, 333 U.S. 10, 13-14 (1948)).

### 3. The Role of and Requirements for Search Warrant Affidavits

In Tennessee, probable cause for issuance of a warrant is established by presenting "a sworn and written affidavit" to the magistrate. Saine, 297 S.W.3d at 205-06; see also Henning, 975 S.W.2d at 294; Jacumin, 778 S.W.2d at 432. "To ensure that the magistrate exercises independent judgment, the affidavit must contain more than mere conclusory allegations by the affiant." Henning, 975 S.W.2d at 294. The affidavit must include facts from which the neutral and detached magistrate may determine, upon examining the affidavit in a commonsense and practical manner, whether probable cause exists. State v. Smotherman, 201 S.W.3d 657, 662 (Tenn. 2006); Henning, 975 S.W.2d at 294. When the affidavit seeks to establish probable cause for a search warrant, it must "set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993). In other words, the affidavit must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized. Saine, 297 S.W.3d at 206 (citing State v. Reid, 91 S.W.3d 247, 273 (Tenn. 2002); Smith, 868 S.W.2d at 572). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." Smith, 868 S.W.2d at 572.

Additionally, in determining whether the nexus has been sufficiently established, courts may "'consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" Saine, 297 S.W.3d at 206 (quoting Reid, 91 S.W.3d at 275). Although a nexus between the place to be searched and the items to be seized must be established, unlike an affidavit in support of an arrest warrant, an affidavit seeking issuance of a search warrant need not implicate a particular person in

the crime under investigation. See Zurcher v. The Stanford Daily, 436 U.S. 547, 556 (1978); United States v. Burney, 778 F.3d 536, 540 (6th Cir. 2015).

"The time of the occurrence of the facts relied upon by the affiant is [also] a prime element in establishing probable cause for the issuance of a search warrant. If the information contained in the affidavit is too old, it is considered stale" and will be insufficient to establish probable cause. W. Mark Ward, Tennessee Criminal Trial Practice, § 4.11 (2016-17 ed.) [hereinafter Tennessee Criminial Trial Practice]; see also Everett v. State, 184 S.W.2d 43, 45 (Tenn. 1944); Welchance v. State, 114 S.W.2d 781, 782 (Tenn. 1938). Nevertheless, there is no hard and fast rule defining staleness, and "[w]hen the illegal activity described is ongoing, courts have generally held that [an] affidavit does not become stale with the passage of time." State v. Thomas, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991); see also State v. Norris, 47 S.W.3d 457, 470-71 (Tenn. Crim. App. 2000); State v. McCary, 119 S.W.3d 226, 249 (Tenn. Crim. App. 2003).

An affidavit may include information that would not be admissible as evidence in a criminal trial, Brinegar, 338 U.S. at 172-73, and an affidavit need not reflect the direct personal observations of the affiant. Henning, 975 S.W.2d at 294; Jacumin, 778 S.W.2d at 432. The reliability of hearsay information included in an affidavit is evaluated differently, however, depending upon its source. State v. Williams, 193 S.W.3d 502, 507 (Tenn. 2006). If the source of the information is a law enforcement officer, "[n]o special showing of reliability is necessary." Smotherman, 201 S.W.3d at 663 (citing Ventresca, 380 U.S. at 111). But this presumption of reliability applies only if the affidavit states that the "information [was] provided by other officers." Id. (citing United States v. Kirk, 781 F.2d 1498, 1505 (11th Cir. 1986)). A presumption of reliability also applies to citizen informants, so long as the affidavit identifies the source of the information as a citizen informant. Williams, 193 S.W.3d at 507.

By contrast, no presumption of reliability applies to information supplied by an unknown informant or an informant from the "criminal milieu." Smotherman, 201 S.W.3d at 662 (citing Williams, 193 S.W.3d at 507; Jacumin, 778 S.W.2d at 436). In such circumstances, the affidavit must establish both the criminal informant's basis of knowledge and his or her veracity or credibility. Williams, 193 S.W.3d at 507 (citing Jacumin, 778 S.W.2d at 436; State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993)).

This two-pronged test derives from two United States Supreme Court decisions—Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969). However, in 1983 the United States Supreme Court abandoned the Aguilar/Spinelli test and adopted a totality-of-the-circumstances analysis for determining whether an affidavit that includes information from a criminal informant establishes probable cause. Gates, 462 U.S. at 238-39. Six years after Gates, however, this Court declined to follow Gates and chose to retain the Aguilar/Spinelli test as a matter of Tennessee constitutional law.

Jacumin, 778 S.W.2d at 436. In the order granting the State's application for permission to appeal in this case, we directed the parties to brief and argue the issue of "whether this Court should revisit the continuing vitality of State v. Jacumin, 778 S.W.2d 430 (Tenn. 1989)." We now take this opportunity to do so.

### 4. *Aguilar/Spinelli* Analysis vs. *Gates* Analysis

In Aguilar, the United States Supreme Court held that the magistrate reviewing a search warrant affidavit "must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was 'credible' or his information 'reliable.'" 378 U.S. at 114. Five years later, in Spinelli, the Supreme Court reiterated these requirements, but added that these prongs could be established through corroborating evidence. 393 U.S. at 415-16. Therefore, under the Aguilar/Spinelli test the affidavit must include facts from which the magistrate may determine the informant's "basis of knowledge" and "veracity" or credibility, and if the information provided fails to establish either prong, corroborating evidence may make up the deficit. Aguilar, 378 U.S. at 114; Spinelli, 393 U.S. at 415-16; Smotherman, 201 S.W.3d at 662; Cauley, 863 S.W.2d at 417; Jacumin, 778 S.W.2d at 432, 436.

The first prong of the Aguilar/Spinelli test—"'basis of knowledge' . . . is concerned with the question, 'How did the informant get the information?' Its purpose is to prevent warrants from being issued based on conjecture or rumors. Generally speaking, facts and circumstances indicating that the information came from an informant who had obtained the information first[-] hand or by personal observation will satisfy this prong." Tennessee Criminal Trial Practice at § 4:10. This prong may also be satisfied when the informant provides "highly detailed" information "such that the magistrate could know that the informant was relating something more than casual rumor or reputation." Id. The second prong of the test, veracity or credibility, "may be satisfied either by (1) demonstrating the informant's credibility or (2) by showing that the information is reliable." Id. In other words, "the affiant must provide some concrete reason why the magistrate should believe the informant," although the "requisite volume or detail of information needed to establish the informant's credibility is not particularly great." State v. Lowe, 949 S.W.2d 300, 305 (Tenn. Crim. App. 1996). Nevertheless, "each prong represents an independently important consideration that must be separately considered and satisfied or supplemented in some way." Jacumin, 778 S.W.2d at 436 (internal quotation marks and citations omitted); see also Smotherman, 201 S.W.3d at 662 (recognizing that each prong must be separately satisfied to establish probable cause).

The Gates Court rejected the proposition (embraced by Jacumin) "that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . ." Gates, 462 U.S. at 230-31 & nn.5-6. The Gates Court held that Aguilar and Spinelli had been misinterpreted and applied in an overly rigid fashion. The Supreme Court declared that "[r]igid legal rules" are "ill-suited" to evaluate informants' tips, which, "'like all other clues and evidence coming to a policeman on the scene[,] may vary greatly in their value and reliability.'" Id. at 232 (quoting Adams v. Williams, 407 U.S. 143, 147 (1972)). The Gates Court commented that the Aguilar/Spinelli test "ha[d] encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate." Id. at 234-35.

The Gates Court theorized that "the type of scrutiny some courts ha[d] deemed appropriate" under the Aguilar/Spinelli test could actually discourage police officers from attempting to obtain warrants and encourage them to "resort to warrantless searches, with the hope of relying on consent or some other exception to the warrant clause that might develop at the time of the search." Id. at 236. As a result, the Gates Court posited that the Aguilar/Spinelli test had served to frustrate the Court's preference for the warrant process, which was reflected in the standard of appellate review—whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing. Id. "The rigorous inquiry" and "complex superstructure of evidentiary and analytical rules" that had developed around the two-pronged test could not be reconciled with the reality that "many warrants are—quite properly—issued on the basis of nontechnical, commonsense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." Id. at 235-36 (internal citations omitted).

The Gates Court also opined that the Aguilar/Spinelli test, when applied rigidly, "poorly serve[d]" the government's most basic function of providing for the security of individual citizens and property because an "anonymous tip seldom could survive a rigorous application" of the two-pronged test, even though "such tips, particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise 'perfect crimes.'" Id. at 237-38. "While a conscientious assessment of the basis for crediting such tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not." Id. at 238.

The Gates Court emphasized, however, "that an informant's 'veracity,' 'reliability' and 'basis of knowledge'" remain "highly relevant in determining the value of his report" under the totality-of-the-circumstances analysis but "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." Gates, 462 U.S. at 230.

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

Id. at 238-39 (internal quotation marks and citations omitted). The Gates Court was "convinced that this flexible, easily applied standard" would "better achieve the accommodation of public and private interests" required by the Fourth Amendment. Id. at 239.

Nevertheless, the Gates Court cautioned that, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur," the Gates Court reiterated that courts should conscientiously review affidavits and strike as insufficient "'bare bones' affidavits" containing conclusions rather than facts. Gates, 462 U.S. at 239. The Gates Court emphasized "the value of corroboration of details of an informant's tip by independent police work" to the totality-of-the-circumstances analysis, id. at 241, and did not discount the value of corroboration of innocent conduct, explaining, "[i]t is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 269, 271 (1960)).

## 5. *The Jacumin Decision*

In declining six years later to follow Gates, the Jacumin Court characterized the totality-of-the-circumstances test as "inadequate as a test of probable cause." Jacumin, 778 S.W.2d at 435. The Jacumin Court conceded that "the task of the issuing magistrates and the duty of the reviewing court[s] . . . are the same under either the Gates standard or the Aguilar[/]Spinelli standard." Id. at 435 n.2. Nevertheless, the Jacumin Court held that the Aguilar/Spinelli standard, "if not applied hypertechnically," provides "a more appropriate structure for probable cause inquiries incident to the issuance of a search warrant than does Gates," Jacumin, 778 S.W.2d at 436, and concluded that the Aguilar/Spinelli standard is "more in keeping with the specific requirement of [a]rticle I, [s]ection 7 of the Tennessee Constitution that a search warrant not issue 'without evidence of the fact committed,'" id. (quoting Tenn. Const. art. I, § 7). The Jacumin Court acknowledged that article I, section 7 of the Tennessee Constitution had previously been interpreted as "identical in intent and purpose" with the Fourth Amendment and that the Court of Criminal Appeals had already applied Gates in several decisions. Jacumin,

778 S.W.2d at 435. The Jacumin Court justified its decision to part company with Gates by referring to prior Tennessee decisions interpreting the open fields doctrine under the state constitution as "somewhat more restrictive than federal cases," id. (citing State v. Lakin, 588 S.W.2d 544, 549 (Tenn. 1979)), and by pointing out that courts in a few other states, specifically Alaska, Massachusetts, Washington, and New York, also had declined to adopt the totality-of-the-circumstances analysis on state constitutional law grounds, describing it as "unacceptably shapeless and permissive," id. at 435-36, and "nebulous," id. at 436 (internal quotations marks omitted). Nevertheless, in subsequent decisions applying the Aguilar/Spinelli standard, this Court, like the Gates Court, has emphasized the role of corroboration:

> The credibility of the informant's information may also be buttressed by independent corroboration of its details. However, it is not necessary to corroborate every detail of the informant's information, or to "directly link the suspect to the commission of the crime." Corroboration of "only innocent aspects of the story" may suffice.

Bishop, 431 S.W.3d at 38 (quoting State v. Melson, 638 S.W.2d 342, 355 (Tenn. 1982)) (internal citation omitted).

### 6. Reconsideration of Jacumin

The overwhelming majority of states now apply the Gates totality-of-the-circumstances analysis for determining whether an affidavit establishes probable cause for issuance of a search warrant.[11] Indeed, Tennessee is one of only a handful of states

---

[11] See State v. Clayton, 155 So. 3d 290, 295-96 (Ala. 2014); State v. McCall, 677 P.2d 920, 929 n.2 (Ariz. 1983) (en banc); Thompson v. State, 658 S.W.2d 350, 352 (Ark. 1983); People v. Camarella, 818 P.2d 63, 67-68 (Cal. 1991) (en banc); People v. Quintana, 785 P.2d 934, 938 (Colo. 1990) (en banc); State v. Barton, 594 A.2d 917, 926-27 (Conn. 1991); Gardner v. State, 567 A.2d 404, 409 (Del. 1989); State v. Butler, 655 So. 2d 1123, 1125 (Fla. 1995); State v. Stephens, 311 S.E.2d 823, 826 (Ga. 1984); State v. Lang, 672 P.2d 561, 562 (Idaho 1983); People v. Tisler, 469 N.E.2d 147, 157 (Ill. 1984); State v. Bousman, 387 N.W.2d 605, 610 (Iowa 1986), subsequently modified by statute as explained in State v. Myers, 570 N.W.2d 70, 73-74 (Iowa 1997); State v. Abu-Isba, 685 P.2d 856, 860 (Kan. 1984); Beemer v. Commonwealth, 665 S.W.2d 912, 915 (Ky. 1984); State v. Ruffin, 448 So. 2d 1274, 1278 (La. 1984); State v. Knowlton, 489 A.2d 529, 533 (Me. 1985); Potts v. State, 479 A.2d 1335, 1340 (Md. 1984); People v. Levine, 600 N.W.2d 622, 626, 629 (Mich. 1999); State v. Zanter, 535 N.W.2d 624, 633 (Minn. 1995); McCommon v. State, 467 So. 2d 940, 941 (Miss. 1985); State v. Hosier, 454 S.W.3d 883, 892 n.6, 894 (Mo. 2015) (en banc); State v. Jensen, 704 P.2d 45, 47 (Mont. 1985); State v. Ildefonso, 634 N.W.2d

that still applies the two-pronged Aguilar/Spinelli test as a matter of state statutory or constitutional law.[12] Having now reconsidered both tests, we conclude that the time has come to abandon the rigid Aguilar/Spinelli test and adopt the Gates totality-of-the-circumstances analysis.

Overruling Jacumin and adopting the Gates totality-of-the-circumstances test is warranted for several reasons. First, the Aguilar/Spinelli test is often applied too rigidly. The decision of the intermediate appellate court in this appeal exemplifies the type of hypertechnical application that this Court warned against in Jacumin. For example, Mr. Davis, the criminal informant, described the DTO with which Son was involved, explained the basis of his own knowledge by admitting that he, too, had been involved with the same DTO, described the type and amount of drugs and the frequency of shipments to Son, identified Son from his driver's license photograph, provided law enforcement with Son's nickname, "Red," described Son's vehicle, described the area where Son resided near Nashville, and stated that Son's whole family was involved in drug trafficking. Rather than seeking a search warrant based solely on the information Mr. Davis provided, law enforcement officials corroborated, in some fashion, almost every aspect of the information, including Mr. Davis's involvment with the DTO, the DTO's Tennessee client known as Red, the type of vehicle Son drove, the location of his residence, Son's meetings with agents of the DTO near the 4571 Dugger Road property,

---

252, 261-62 (Neb. 2001); Barrett v. State, 775 P.2d 1276, 1277 (Nev. 1989); State v. Carroll, 552 A.2d 69, 73-74 (N.H. 1988); State v. Novembrino, 519 A.2d 820, 836 n.11 (N.J. 1987); State v. Hughes, 539 S.E.2d 625, 628 (N.C. 2000); State v. Ringquist, 433 N.W.2d 207, 212 (N.D. 1988); State v. George, 544 N.E.2d 640, 643-45 (Ohio 1989); Langham v. State, 787 P.2d 1279, 1280-81 (Okla. Crim. App. 1990); Commonwealth v. Gray, 503 A.2d 921, 925-26 (Pa. 1985); State v. Pratt, 641 A.2d 732, 736 (R.I. 1994); State v. Jones, 536 S.E.2d 675, 678-79 (S.C. 2000); State v. Raveydts, 691 N.W.2d 290, 293 (S.D. 2004); Green v. State, 736 S.W.2d 218, 219 (Tex. App. 1987); State v. Espinoza, 723 P.2d 420, 421 (Utah 1986); Derr v. Commonwealth, 410 S.E.2d 662, 666 (Va. 1991); State v. Adkins, 346 S.E.2d 762, 773-74 (W. Va. 1986); State v. Robinson, 786 N.W.2d 463, 471-72 n.11 (Wis. 2010); Bonsness v. State, 672 P.2d 1291, 1293 (Wyo. 1983).

[12] State v. Jones, 706 P.2d 317, 322-24 (Alaska 1985); Carlisle ex rel. State v. Ten Thousand Four Hundred Forty-Seven Dollars in U.S. Currency ($10,447.00), 89 P.3d 823, 830 n.9 (Haw. 2004); Commonwealth v. Upton, 476 N.E.2d 548, 556 (Mass. 1985); State v. Cordova, 784 P.2d 30, 36 (N.M. 1989); People v. DiFalco, 610 N.E.2d 352, 353 n.1 (N.Y. 1993); State v. Coffey, 788 P.2d 424, 426 n.4 (Or. 1990); State v. Goldberg, 872 A.2d 378, 381 (Vt. 2005); State v. Jackson, 688 P.2d 136, 141-43 (Wash. 1984) (en banc).

at which Son had previously concealed cash derived from the illegal drug trade, and even his family's previous involvement in Son's earlier drug trafficking activities.

The intermediate appellate court majority correctly acknowledged that the affidavit was "replete" with corroboration of the information Mr. Davis provided implicating Son in drug trafficking activities, but it held the affidavit insufficient because it lacked facts connecting or implicating the defendant in Son's drug trafficking activities. In reaching this conclusion, the intermediate appellate court dissected and parsed Mr. Davis's statement and considered in isolation each aspect of the information, as well as the independent corroboration, searching for direct corroborating evidence of each detail, even though this Court has previously explained that it is not necessary to corroborate every detail of an informant's information. Bishop, 431 S.W.3d at 38. The intermediate appellate court also apparently failed to recognize that information implicating the defendant in the underlying crime was not necessary to establish probable cause for issuance of a search warrant for a certain property, so long as the affidavit included facts establishing a nexus between the 4571 Dugger Road property and the drugs. See Zurcher, 436 U.S. at 556 ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.")

Second, unlike the Jacumin Court, we have the benefit of years of experience applying Jacumin and have had the opportunity to review numerous cases from other jurisdictions applying Gates. Time has proven that the totality-of-the-circumstances analysis is not inadequate or too nebulous as a test for determining probable cause. Under Gates, "an informant's 'veracity,' 'reliability,' and 'basis of knowledge'" remain "highly relevant in determining the value of his report," Gates, 462 U.S. at 230. But by ensuring that these factors are not viewed as entirely separate prerequisites to probable cause, requiring rigid, formulistic, and technical analysis, Gates actually improves upon the Aguilar/Spinelli test. Id. at 230-31.

Moreover, as the Gates Court explained, the totality-of-the-circumstances analysis is much more consistent with the nontechnical, commonsense approach courts already apply when determining whether probable cause exists. Id. Indeed, although the Jacumin Court retained the Aguilar/Spinelli test, it expressly embraced the manner in which the Gates Court described the role of the magistrate in assessing probable cause, Jacumin, 778 S.W.2d at 435 n.2, and we have reaffirmed this standard as the governing law in Tennessee, see, e.g. Saine, 297 S.W.3d at 206 (stating that the task of the magistrate is to read the affidavit "in a commonsense and practical manner"); State v. Carter, 160 S.W.3d 526, 533 (Tenn. 2005) (same); Henning, 975 S.W.2d at 294 (same).

Finally, it is certainly true, as the Jacumin Court recognized, that this Court has the authority to interpret the Tennessee Constitution differently than the federal constitution and has recognized that textual differences between federal and state constitutional provisions may support doing so. State v. Watkins, 362 S.W.3d 530, 554-55 (Tenn. 2012); State v. Vineyard, 958 S.W.2d 730, 733-34 (Tenn. 1997). It is also true, as the Jacumin Court pointed out, that the text of article I, section 7 differs from the text of the Fourth Amendment by precluding issuance of a warrant "without evidence of the fact committed." Tenn. Const. art. I, § 7. However, the Jacumin Court failed to recognize that the Fourth Amendment has also been interpreted as precluding issuance of a warrant unless facts, rather than conclusions, are presented to a magistrate to establish probable cause. See, e.g., Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 325 (1979) (finding search warrant affidavit containing only conclusory statements of the police investigator without supporting facts insufficient to establish probable cause under the Fourth Amendment). Indeed, the Gates Court expressly reaffirmed this principle, stating, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Gates, 462 U.S. at 239. Therefore, over time the Fourth Amendment has been interpreted by federal courts in a manner that is entirely consistent with the text of article I, section 7.

Ironically, despite concluding that the text of article I, section 7 required adoption of a test distinct from that applied under the Fourth Amendment, the test the Jacumin Court adopted as the appropriate standard for the Tennessee Constitution derived from decisions of the United States Supreme Court interpreting the Fourth Amendment. The Jacumin Court actually acknowledged that the test it adopted did not derive from any settled development of Tennessee constitutional law founded in the text of article I, section 7. Jacumin, 778 S.W.2d at 435 ("[I]t is perhaps significant that amicus does not point to a settled development of state constitutional law in the area of probable cause to support a search warrant analogous to the 'open fields' doctrine."). The Jacumin Court also acknowledged that article I, section 7 had long been interpreted as "identical in intent and purpose" to the Fourth Amendment, with federal cases interpreting the Fourth Amendment regarded as particularly persuasive. Jacumin, 778 S.W.2d at 435 (citing Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). We have recently reiterated these principles. See, e.g., State v. Willis, 496 S.W.3d 653, 719 (Tenn. 2016); State v. Davis, 484 S.W.3d 138, 143 (Tenn. 2016). We are not convinced that the textual difference between article I, section 7 and the Fourth Amendment ever supported departing from these general principles.

For all these reasons, we overrule Jacumin, insofar as it retained the Aguilar/Spinelli test, and adopt the Gates totality-of-the-circumstances analysis, which is, in our judgment and that of the vast majority of courts in other states, a sufficiently definite standard for assessing probable cause and much better suited to evaluating the practicalities that underlie the probable cause inquiry. We reiterate that, under the

totality-of-the-circumstances analysis, the informant's basis of knowledge and veracity or credibility remain highly relevant considerations. Rather than separate and independent considerations, they "should [now] be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." Gates, 462 U.S. at 230. Thus, we will apply the Gates test to determine whether the affidavit sufficiently established probable cause for issuance of the warrant.

## 7. *False Information in the Affidavit*

Before applying the totality-of-the circumstances analysis in this case, we must first review the Court of Criminal Appeals' ruling that Trooper Boyd recklessly included false statements in paragraphs eighteen and thirty-seven of the affidavit. This ruling, if upheld, would require us to exclude the information in those paragraphs when assessing whether the affidavit sufficiently established probable cause.

 "[T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face[:] (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause[;] and (2) a false statement, essential to the establishment of probable cause, recklessly made." State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978). "Allegations of negligence or innocent mistakes are insufficient to invalidate the search warrant." State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (citing Franks v. Delaware, 438 U.S. 154, 171 (1978)). The defendant bears the burden of proving the allegation of falsity by a preponderance of the evidence. Id. (citing Franks, 438 U.S. at 156).

As already noted, the defendant here alleged that false statements were included in paragraphs eighteen and thirty-seven of the affidavit. The trial court agreed with the defendant as to paragraph eighteen, concluding that the following statement in that paragraph falsely indicated that Trooper Boyd had observed the offloading of marijuana at the defendant's residence: "As further described below [Son] used this residence on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in excess of 100 pounds." But the trial court concluded that Trooper Boyd's description of the GPS ping of Mr. Medina's cell phone as the same "location" where Son's truck had been observed three weeks earlier was not false. Furthermore, the trial court concluded that, while paragraph eighteen included a false statement, the statement had not been recklessly made and was not material to probable cause. The Court of Criminal Appeals disagreed, concluding that both statements were false, were recklessly made, and were material to establishing probable cause. We are of the opinion that neither statement was false.

Nowhere in paragraph eighteen did Trooper Boyd state or imply that he, or anyone else, had observed the offloading of marijuana at the defendant's residence. Rather, he merely expressed his belief, "[a]s further described below" that Son "had used the

- 26 -

residence on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in excess of 100 pounds." Furthermore, in the portions of the affidavit that followed this statement of his belief, Trooper Boyd did not state, suggest, or imply that he or anyone else had actually observed drugs being offloaded on the property or at the defendant's residence. The magistrate was free to review the description Trooper Boyd provided and either agree or disagree with Trooper Boyd's belief regarding Son's use of the "residence" to offload drugs.

During his testimony at the suppression hearing Trooper Boyd agreed that he should have used "property" rather than "residence" in paragraph eighteen, because he did not actually believe the drugs had been offloaded at the defendant's "residence." We, too, believe "property" would have been a better word choice, given that the property in question comprised nearly six acres. However, "affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity . . . have no proper place in this arena." Ventresca, 380 U.S. at 108; see also Norris, 47 S.W.3d at 468 (explaining that an affiant's words should be given their ordinary meaning and interpretation). Hypertechnical judicial review of affidavits "'tends to demean our system of justice and to weaken society's confidence in it.'" Bishop, 431 S.W.3d at 38 (quoting State v. Moon, 841 S.W.2d 336, 342 (Tenn. Crim. App. 1992)). Tested against this standard, we have no hesitation in concluding that the language in paragraph eighteen, although admittedly imprecise and perhaps resulting from negligence, does not constitute a false statement.

The same is true of the language in paragraph thirty-seven. As the trial court recognized, GPS has a range of accuracy. All of the testimony at the suppression hearing indicated that Google identified the location of the GPS coordinates listed in paragraph thirty-seven as 4571 Dugger Road. In reversing the trial court, the intermediate appellate court appears to have interpreted "location" in paragraph thirty-seven as denoting a particular spot on the driveway outside the defendant's residence where Son's truck had been observed three weeks earlier. This interpretation is simply overly technical and unrealistic. Trooper Boyd did not say that the GPS coordinates placed Mr. Medina's cell phone on the driveway where Son's vehicle was parked. He said only that the GPS ping placed it at the same "location" where the Son's vehicle had been seen three weeks earlier. The proof at the suppression hearing established that the GPS coordinates included in paragraph thirty-seven accurately reflected where the drug transaction occurred on the 4571 Dugger Road property. Accordingly, while the record establishes that Trooper Boyd could have chosen more precise language, it fails to establish that he recklessly included false information in the affidavit. At most, he made two innocent mistakes in wording the affidavit—mistakes that are typical when nonlawyers draft affidavits "in the midst and haste of a criminal investigation." Ventresca, 380 U.S. at 108. Having so concluded, we turn next to consider whether the affidavit sufficiently established probable cause.

### 8.  *Sufficiency of Trooper Boyd's Affidavit under the* <u>Gates</u> *Standard*

Applying the previously discussed standards, we conclude that Trooper Boyd's affidavit provided the magistrate with a substantial basis for concluding from the totality of the circumstances that a search warrant for the almost six-acre 4571 Dugger Road property would uncover evidence of wrongdoing.  The affidavit explained how the investigation began, recited the information Mr. Davis had provided, including: that an out-of-state DTO, represented by Mr. Medina, was delivering large quantities of marijuana to Son in Tennessee multiple times each month; that Son drove a white Nissan Truck and went by the nickname Red; and that Son's whole family was involved in trafficking drugs.  The affidavit also described the ways in which law enforcement officials had corroborated Mr. Davis's information, including confirming his involvement with the same DTO.  The affidavit explained that Son had pleaded guilty in 2002 to criminal offenses arising from his involvement in drug trafficking activities and that Son had concealed cash derived from his earlier drug trafficking activities at the defendant's residence located on the 4571 Dugger Road property.  The affidavit detailed how wiretaps and surveillance had confirmed that the DTO with which Mr. Medina was affiliated had been transporting large shipments of marijuana from other states into Tennessee and that the DTO had previously dealt with Mr. Davis.  The affidavit also relayed how wiretaps and surveillance had confirmed that Son was working with Mr. Medina's DTO and that Son was known as Red.  The affidavit described how law enforcement officials had observed Son meeting with agents of the DTO twice at markets just off Interstate 65 and near the 4571 Dugger Road property and had observed the DTO agent follow Son onto a rural road leading to the 4571 Dugger Road Property.  The affidavit explained that officers were unable to follow Son and the DTO agent onto the rural road, but on the first occasion, later observed Son's vehicle parked in the driveway of the defendant's residence on the 4571 Dugger Road property, and on the second occasion, a GPS ping of Mr. Medina's cellphone indicated that the phone was located on the 4571 Dugger Road property.  Additionally, the affidavit listed a great deal of information that Trooper Boyd had learned from his own experience and training about how drug traffickers function, including the typical locations that are used to conceal drugs and proceeds from drug trafficking.

When the totality of the circumstances detailed in the affidavit are viewed in a commonsense and practical manner, we have no hesitation in concluding that the affidavit provided the magistrate with a substantial basis for determining that a search of the 4571 Dugger Road property would uncover evidence of wrongdoing.  In reaching this conclusion, we necessarily reject the defendant's argument that the affidavit failed to provide a sufficient nexus between the drugs and the 4571 Dugger Road property and his assertion that the facts purporting to do so were stale.  In our judgment, a sufficient nexus between the drugs and the property was established because the officers *twice* observed Son and an agent of the DTO meeting near the 4571 Dugger Road property and driving onto a rural road leading to the property.  Although officers were unable to follow them

onto the rural road for fear of discovery, on one occasion officers observed Son's truck parked in the driveway of the defendant's residence, and on the second occasion, officers obtained a GPS ping placing Mr. Medina's cell phone on the property.

Although it is true that officers waited until April 23, 2012, three weeks after Son met Mr. Medina on April 2, 2012, to seek a search warrant, the affidavit included subsequently obtained information establishing that Son's drug trafficking activities with Mr. Medina were ongoing. For example, the affidavit quotes portions of an April 11, 2012 conversation between Son and Mr. Medina in which Son is complaining that he had received only 157 pounds of marijuana when he had paid for 170 pounds, and Mr. Medina assuring Son that he would receive credit for the shortage, which Trooper Boyd interpreted, based on his experience, as meaning that Son would receive credit in future shipments. This conversation occurred only twelve days before the officers sought the warrant. As already noted, "[w]hen the illegal activity described is ongoing, courts have generally held that [an] affidavit does not become stale with the passage of time." Thomas, 818 S.W.2d at 357. This rule applies here, where the affidavit included facts indicating that the illegal drug trafficking was ongoing.

Accordingly, we hold that the affidavit sufficiently established probable cause, reverse the decision of the Court of Criminal Appeals holding otherwise, and reinstate the judgment of the trial court denying the defendant's motion to suppress.

### III. Sufficiency of the Trial Evidence

We next consider whether the Court of Criminal Appeals erred in concluding that the evidence was legally insufficient to support the defendant's convictions for conspiracy to possess over 300 pounds of marijuana with intent to sell it and conspiracy to commit money laundering.

### A. Trial Proof

At trial, Trooper Boyd testified consistently with his April 23, 2012 affidavit and his testimony at the pretrial suppression hearing, as previously set forth. He further explained that, in addition to the search warrant for the 4571 Dugger Road property, he also had obtained warrants for two other places Son frequented: an apartment in Antioch and the Remuda Circle address in Smyrna. All three search warrants were executed at approximately the same time on April 24, 2012. During the search of the Antioch apartment officers recovered less than a pound of marijuana and approximately $11,000. At the Remuda Circle address officers seized approximately eighty-five pounds of marijuana, packaged in gallon-sized plastic bags, that were stored inside plastic storage bins. Other items seized included more than $100,000 cash, Son's white Nissan Titan truck, a drug ledger, and a suitcase, because suitcases were used to transport the marijuana from Alabama to Tennessee on March 16, 2012, and April 2, 2012. Four or

five cell phones also were seized from the Remuda Circle address, but no text messages or voice mails were discovered between the defendant and Son regarding drug trafficking. Trooper Boyd also knew of no communications between the defendant and Mr. Medina or any other Hispanic drug dealers. Additionally Son's drug ledger, located at the Remuda Circle address, did not mention the defendant. Trooper Boyd noted that it would have been unnecessary for the defendant to talk with anyone except Son if their agreement entailed the defendant keeping Son's money at the 4571 Dugger Road property and allowing Son to receive shipments of marijuana on that property. Trooper Boyd pointed out that they could have agreed to communicate about their illegal activities in person, which would explain why officers found no incriminating text messages or cell phone calls between them. Furthermore, Trooper Boyd testified that the marijuana discovered at the Remuda Circle address had the same packaging, the same compressed texture, and was of the same Mexican type as that found at the 4571 Dugger Road property. Trooper Boyd admitted that, while the plastic bags, material used to package the marijuana, and even the suitcases at the Remuda Circle address smelled of axle grease, which drug traffickers often use to conceal the scent of the marijuana, no axle grease was found on the packaging or marijuana discovered at the 4571 Dugger Road property. Trooper Boyd also conceded that no law enforcement officer had actually seen any drugs during the investigation and had only seen suitcases being unloaded and loaded. He explained, however, that it was not unusual for officers not to see drugs during an investigation because drugs are ordinarily concealed.

Adrian Breedlove, a Brentwood police officer assigned to Nashville DEA, testified that, on March 16, 2012, he conducted surveillance on a maroon Ford Expedition and relayed information to other officers and agents conducting surveillance. He observed the Expedition leave Interstate 65 at exit 37 and stop at a nearby gas station, and he noticed that the driver of the vehicle was a Hispanic male, later identified as Mr. Jaramillo. Officer Breedlove discontinued surveillance and left the gas station when another member of the surveillance team arrived. Not long after leaving the gas station, Officer Breedlove drove past the 4571 Dugger Road property and saw a white Nissan Titan truck parked in the driveway of residence. He entered the tag number of the vehicle into a computer database and learned that the truck was registered to Son. Officer Breedlove admitted that he had not seen Son or the defendant on March 16, 2012, only Son's vehicle.

Officer Breedlove also participated in the search of the 4571 Dugger Road property on April 24, 2012, along with about a dozen other officers from various agencies. He testified as follows about statements the defendant made on the day the warrant was executed and about items that were discovered during the search. The defendant told officers that he had guns in the house, and officers discovered a loaded .45 semiautomatic pistol under the couch cushions in the den and an unloaded nine millimeter pistol under the couch. They also found a rifle inside a case in a bathroom and a bolt-action rifle underneath a bed. In the master bedroom, officers found four more

rifles, rifle magazines, three shotguns, a .50 caliber muzzle loader, and a revolver. On the top shelf of the closet in the master bedroom officers also found a large electronic scale, capable of weighing items up to thirteen pounds, and, on top of this scale, officers discovered a bag containing marijuana. A second plastic bag containing smaller Ziploc bags of marijuana was also found in this closet. In this same closet, near the marijuana and scales, officers found between $20,000 and $22,000 cash inside a jacket pocket. Officers discovered a smaller scale capable of weighing items up to two pounds inside a drawer and a small plastic bag of marijuana. In the master bedroom dresser drawer, officers discovered a plastic bag containing cocaine and $75,000 in cash, comprised of $100 and $50 dollar bills. A second small bag of cocaine was found inside a roll top desk in the den. A third bag of cocaine was discovered on a kitchen shelf above the refrigerator. Based on the amount of cocaine in the bags, Officer Breedlove opined that it was likely for personal use. Officers also found a money counting machine, other small bags of marijuana, a metal grinder commonly used to grind marijuana into a powder, several butts of marijuana cigarettes, and two pipes that smelled strongly of marijuana.

Officer Breedlove testified that some of the marijuana found at the defendant's residence was still "bricked up"—meaning tightly compressed for easier transport—and had not been processed for sale. No intact bricks of the marijuana were discovered at Son's Remuda Circle Smyrna address. Nevertheless, Officer Breedlove asserted that the marijuana found at both places had "similar packaging and pressing techniques." He also noted that the marijuana found at Son's Remuda Circle address and that found at the defendant's residence had the same stems and seeds present. Officer Breedlove explained that the more marijuana is "bricked up," the closer it is to the initial source. He also stated that when prepared for retail dealers and end users, marijuana is divided into smaller quantities.

According to Officer Breedlove, the defendant told officers that the marijuana and drugs inside his home belonged to him and had come "from Mexicans." The defendant denied that Son had anything to do with the marijuana found inside his residence when Officer Breedlove pointed out that the marijuana found at the defendant's residence was very similar to the marijuana found at Son's Remuda Circle address.

Outside the defendant's residence, officers found an Igloo cooler containing several marijuana plants in black trash bags. Inside the trunk of a Honda Civic parked directly in front of the defendant's residence, officers located a large ammunition can, eleven firearms—some of them semiautomatic—and ammunition for these weapons. Inside the ammunition can, officers found $1,000,300 cash, all in one hundred dollar bills. Officers also located numerous other items of personal property, including vehicles and farming equipment.

When the defendant saw the officers discover the items in the Civic's trunk, he remarked, "They found my money." The defendant told officers the ammunition can

contained about a million dollars and said that he had earned the money cutting hay. As for the weapons, the defendant claimed that he had them for protection because rumors had circulated for years that he had $1,000,000 buried on his property, and numerous trespassers had attempted to steal his money. The defendant denied that the ammunition can containing the money had ever been buried and said that he had placed it in the trunk of the Civic a year earlier, in 2011, when he purchased the vehicle. The defendant said that he had stored the money in the Civic near his residence so he could more easily watch it. The defendant insisted that the money belonged to him, not to Son. When asked about Son's truck being seen at his home on March 16, 2012, the defendant replied that he had not seen Son or any Hispanics near his home that day but conceded that he could have been at work. Officer Breedlove acknowledged that no drug ledgers or other documents connecting the defendant to the drug trade were found at the defendant's residence.

Jimmy Mann, an officer with the Dickson police department assigned to DEA Nashville, testified that he had assisted with surveillance in this case. On April 2, 2012, Officer Mann drove to exit 32, the Culleoka exit, and waited at a Citgo gas station. At the time, he knew that he was looking for a white Nissan Titan truck and a Lincoln Navigator. Neither of these vehicles was present when he arrived, so Officer Mann parked next to the building and waited. Five minutes later, a white Nissan Titan truck pulled next to the gas pumps, and Son exited the vehicle and began pumping gas. Approximately fifteen minutes later, a Navigator pulled into the gas station and parked in front of him. Officer Mann identified the driver of the Navigator as Mr. Medina. Son and Mr. Medina went inside the store together, came back out, and got into their vehicles. They left the store at the same time, travelling in the direction of the 4571 Dugger Road property, with Son's truck in the lead. Other officers picked up surveillance on the vehicles when they left the gas station. Officer Mann acknowledged that the defendant was not in either of the vehicles that he observed on April 2, 2012.

Joel Rowney, a detective with the Nashville Police Department assigned to the 20th Judicial District Drug Task Force, testified that he arrived at 4571 Dugger Road on April 24, 2012, while the search warrant was being executed, but after the defendant's residence had been searched. The defendant and his wife answered a few questions but then refused to speak with him further. Detective Rowney stated that most of the cash seized on the property was discovered in the ammunition can found in the trunk of the Civic. Detective Rowney said the can was covered in dirt, which suggested it had been buried. The cash in the ammunition can consisted entirely of $100 bills, which had been issued before the year 2000. Rubber bands used to bundle the cash had adhered to money. Based on the condition of the ammunition can, the rubber bands, and the issuance dates of the bills, Detective Rowney concluded that the money had been buried or concealed for over twelve years.

Detective Rowney stated that he did not issue a written notice of seizure to the defendant on the date the cash was seized. Instead, his secretary sent the notice of seizure to the defendant by certified mail at a later date that Detective Rowney could not recall. Detective Rowney explained that it had been his practice for eleven years to list the date of delivery of the notice of seizure as the date the property was seized, regardless of the date the notice of seizure was actually delivered. Detective Rowney explained that when a large amount of cash is seized, the standard procedure is for officers to deliver the cash to a bank, so that it can be counted and the total verified. Thereafter, officers send the owner a notice of seizure via certified mail, listing the accurate and verified total of the cash seized. The bank had closed by the time officers finished executing the search warrant on April 24, 2012. Therefore, Detective Rowney informed the defendant that he would receive a notice later via certified mail. Detective Rowney acknowledged that, although the currency had been issued before the year 2000, someone could have removed and used cash from the stockpile without replacing it with newer bills.

Lieutenant Doelle testified that officers seized approximately eight pounds of marijuana and nearly a half ounce of cocaine from the 4571 Dugger Road property. Officers seized approximately eighty-five pounds of marijuana from Son's Remuda Circle Smyrna address. Several other items of personal property believed to have been derived from the sale of illegal drugs were also seized from the 4571 Dugger Road property, including vehicles and farming equipment. He testified that when the warrant was executed on April 24, 2012, the defendant already had a felony conviction.

Proof showed that Tammy A. Tuttle worked in a non-skilled position at a medical laboratory preparing specimens and earned between $15,000 and $17,000 annually from 2007 to 2012. Additionally, tax records indicated that Ms. Tuttle had income of $15,075 in 2007 and $15,427 in 2008. Income tax records indicated the defendant, a farmer, had a net loss of $194 in 2007 and income of only $1613 in 2008. In 2011, the defendant had received Social Security benefits of $5,928. The defendant and his wife had approximately $20,000 in savings and checking accounts. Lieutenant Doelle acknowledged that the defendant had earned some income from cutting hay, but Lieutenant Doelle found no evidence of earned income, checks, or lottery winnings sufficient to explain how the defendant had accumulated the more than one million dollars found on the 4571 Dugger Road property.

Chris Hill, an employee with the Board of Probation and Parole, testified that Son was continuously incarcerated from August 5, 2000, until his release on June 23, 2011.

Cleto Medina, who had already entered guilty pleas to his participation in the activities giving rise to this case, testified that he had never seen the defendant nor conducted any drug deals with the defendant. Nevertheless, Mr. Medina confirmed that, in March and April 2012, marijuana had been transported from Alabama to Tennessee and delivered to a man known as "Red" or "Rojo," whom Mr. Medina identified as Son.

Mr. Medina stated that two deliveries were made to other locations in middle Tennessee prior to March 16, 2012, Mr. Medina stated that his brother delivered marijuana to Son in a maroon Ford Expedition on March 16, 2012, and that he had delivered marijuana to Son on April 2, 2012, in his Lincoln Navigator to the 4571 Dugger Road property. Mr. Medina stated that the marijuana was packaged in blocks, covered in axle grease, and placed in suitcases for the deliveries. Each of the pre-March 16, 2012 deliveries consisted of 100 pounds of marijuana, as did the delivery on March 16, 2012. However, the April 2, 2012 delivery was supposed to consist of 170 pounds of marijuana, although Son later informed him that the marijuana had weighed only 157 pounds.

Mr. Medina described the transaction on April 2, 2012, in which he had participated, stating that Son had instructed him to call when he reached exit 32 off Interstate 65. When Mr. Medina did so, Son gave him directions to a gas station ten to fifteen minutes away. They met at the gas station, and Mr. Medina followed Son to a wooded area on the 4571 Dugger Road property, where he delivered the marijuana to Son. According to Mr. Medina, the marijuana was priced at $675 per pound, and Son paid cash for the delivery, mostly in $100 bills.

Following the drug transaction, Mr. Medina returned to the Interstate via the route he had previously taken. Mr. Medina never met with Son again, because he was arrested two or three weeks after the April 2, 2012 drug transaction.

After his arrest, Mr. Medina viewed an aerial photograph of the 4571 Dugger Road property and marked on it the narrow dirt road location where the transaction occurred. Mr. Medina stated that the defendant's mobile home was not visible from that location. Mr. Medina also directed Officer David Stanfield along the route Son had driven from the gas station to the wooded area of the 4571 Dugger Road property.

### B. Standards for Evaluating the Sufficiency of the Evidence

"Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt; thus, on appeal a defendant bears the burden of demonstrating why the evidence is insufficient to support the conviction. Id. (citing State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011)). On appeal, the State is afforded the strongest legitimate view of the evidence presented at trial and any reasonable and legitimate inferences that may be drawn from the evidence. Id. (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Campbell, 245 S.W.3d

331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). "This Court neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659)). Circumstantial and direct evidence are reviewed under the same standards. Id. (citing State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011)). Circumstantial evidence is alone a sufficient basis to support a conviction, and circumstantial evidence need not exclude every reasonable hypothesis except that of guilt. Id. (citing Dorantes, 331 S.W.3d at 381).

## C. Application of the Legal Standards

We agree with the State that the evidence presented at trial is sufficient to support the defendant's conviction of conspiracy to possess over 300 pounds of marijuana with the intent to sell it.

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

Tenn. Code Ann. § 39-12-103. The relevant offense to this appeal is defined as "knowingly . . . [p]ossess[ing] a controlled substance with intent to . . . sell the controlled substance," Tenn. Code Ann. § 39-17-417(a)(4), and the controlled substance is "[t]hree hundred pounds (300 lbs.) (136,050 grams) or more of any substance containing marijuana," id. § 39-17-417(j)(13).

In this case, the prosecution offered both direct and circumstantial evidence establishing that Son met with an agent of the DTO and then drove toward the 4571 Dugger Road property on which the defendant resided, with the DTO agent following him. After the first meeting on March 16, 2012, officers observed Son's vehicle parked in the defendant's driveway, and after the second meeting on April 2, 2012, officers obtained a GPS ping indicating that Mr. Medina's phone was located on the 4571 Dugger Road property. Mr. Medina testified at trial that he and Son had conducted the April 2, 2012 drug transaction on that property.

The prosecution also presented circumstantial evidence establishing that the defendant was aware of Son's drug trafficking activity and aided him with it. For example, officers discovered eight pounds of marijuana in the defendant's residence, and it was packaged in a manner very similar to the marijuana discovered at Son's Remuda Circle Smyrna address. The defendant admitted that this marijuana belonged to him, although he denied Son had anything to do with it. Some of the marijuana had been processed while some of it remained compressed or "bricked up." Some of the marijuana

had already been packaged into smaller Ziploc baggies in a manner that would facilitate resale, and between $20,000 to $22,000 cash was discovered next to this marijuana. Officers discovered scales and a grinder in defendant's residence—equipment used to prepare and process compressed marijuana for resale to end users. Officers also located a money-counting machine, which would have aided the defendant in keeping account of the proceeds of drug sales. Viewed in a light most favorable to the State, we conclude that this evidence was sufficient to support the defendant's conviction for conspiracy to possess over 300 pounds of marijuana with the intent to sell it.

In concluding that the proof was insufficient to support the defendant's conviction, the Court of Criminal Appeals pointed out that no witnesses had observed Son and the defendant conspiring together and that the proof established only that Son and the defendant both were engaged in drug trafficking, not that they were working together in the illegal drug trade. This analysis might be appropriate were the Court of Criminal Appeals tasked with resolving factual issues and deciding the defendant's guilt or innocence in the first instance. However, those tasks are reserved for the jury, not reviewing appellate courts. Here, the evidence is sufficient to support the jury's determination that Son and the defendant were conspiring together in the marijuana drug trafficking operation.

The proof also is sufficient to support the defendant's conviction for conspiracy to commit money laundering. Money laundering is defined in pertinent part as follows:

> It is an offense to knowingly use, conspire to use or attempt to use proceeds derived directly or indirectly from a specified unlawful activity to conduct or attempt to conduct a financial transaction or to make other disposition with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds.

Tenn. Code Ann. § 39-14-903(a)(1). Here, the State offered proof to show that the combined income of the defendant and his wife would not have accounted for the large amounts of cash found in the defendant's possession. Ms. Tuttle had income of $15,000 to 17,000 per year during the relevant time, and tax records indicated that the defendant had a loss in one year and income of $1,613 in another year. Yet, officers found $20,000 to $22,000 cash inside a jacket pocket in the master bedroom closet, next to the marijuana and one of the electronic scales. Officers found $75,000 more in cash inside a dresser drawer in the bedroom and located an ammunition can in the trunk of the Civic outside containing $1,000,300 cash. The ammunition can was surrounded by semiautomatic weapons. From this proof, the jury could have rationally concluded, beyond a reasonable doubt, that the money, in whole or in part, derived from the drug trafficking conspiracy in which the defendant and Son were engaged.

## IV.  Forfeiture

### A.  *Post-Trial Forfeiture Hearing Proof*

The day after the jury returned its verdict, the trial court held a hearing on the forfeiture count of the indictment.  At the beginning of this hearing, the State announced that the trial court had heard "90 percent of the proof" related to the forfeiture during the trial, but the State elected to present two additional witnesses.

Phillip Taylor, a state investigator with the 20th Judicial District Drug Task Force, testified about his participation in the 2000 investigation into Son's drug trafficking activities, explaining that Son was stopped in February 2000, while in possession of drug records and $30,000 cash.  Son's wife was stopped the same day and also had $30,000 cash in her vehicle.  In July 2000, law enforcement authorities linked Son to a rental truck containing 2,600 pounds of marijuana through statements of co-conspirators and Son's wife.  In August 2000, law enforcement authorities also seized 2,200 pounds of marijuana from a van in Son's possession, and during the arrest, seized $25,000 cash from Son's person.  After officers seized the van in August 2000, they searched the defendant's residence pursuant to a warrant and found an ammunition can containing a plastic bag with $112,000 cash.  Written on the outside of the bag were "C.T. $200,000."  The ammunition can was caked with mud.  Law enforcement authorities had heard that more money was buried on the 4571 Dugger Road property, but they were unable to locate it during the 2000 search.  As a result of that investigation, however, the defendant pled guilty to conspiracy to commit money laundering and conspiracy to sell more than seventy pounds of marijuana.  Son also pled guilty to multiple charges and was incarcerated as a result of those convictions until June 2011.

Lieutenant Doelle testified about several items of personal property that were seized during the April 24, 2012 search of the 4571 Dugger Road property.  The trial court had instructed him not to mention any of these seized items, all purchased before 2004, in his trial testimony.  The items included a car, trucks, and two tractors.  Lieutenant Doelle acknowledged that he had no evidence that any of this property was acquired by the defendant in violation of any statute.  He also stated that smaller items of personal property, in addition to those mentioned at trial, had been seized as well, as had two of the defendant's bank accounts—one containing approximately $20,000 and the other approximately $27,000. When questioned about monthly Social Security checks that had been deposited into the account containing $27,000 and the defendant's earnings from his hay business, Lieutenant Doelle expressed his belief that the account contained drug proceeds comingled with legitimate monies, but he was not able to track any drug funds to that account.  Although he believed all of the personal property officers seized had been purchased or maintained with proceeds from the sale of illegal drugs, he was unable to identify any specific drug transactions from which the proceeds derived.  He

described the ammunition can found in the Civic as covered in dirt and appearing to have been buried in the ground, much like the ammunition can officers seized in 2000.

Lieutenant Doelle conceded that he did not know when the defendant acquired or received the cash, nor did he know of any specific drug transactions that resulted in the defendant acquiring the currency. However, he stated that the defendant had not acquired the cash found in the Civic within the last five years, although it appeared the defendant had placed the ammunition can in the Civic during that time so he could more readily access the money. While he acknowledged that the money found in the Civic was comprised entirely of bills issued before the year 2000, he was unsure whether the money found inside the defendant's residence was also comprised of currency issued before 2000. Lieutenant Doelle opined that it would take an entire lifetime to save $1,000,000 from social security or farming revenue, even for a person with no expenses.

## B. Court Action

The trial court denied forfeiture of "all personal property acquired before 2007" and the money seized from the defendant's bank accounts but ordered forfeiture of all other personal property, including the $1,098,050 cash discovered on the 4571 Dugger Road property. The trial court found that the items were "directly or indirectly, acquired by or received in violation of the drug statutes [and] subject to judicial forfeiture."

The Court of Criminal Appeals unanimously affirmed the trial court's ruling directing forfeiture of the $1,098,050 cash. The intermediate appellate court concluded that the defendant's 2002 guilty pleas to conspiracy to commit money laundering and possession of drugs with intent to distribute supported the forfeiture. Although the Court of Criminal Appeals acknowledged that the seizure had not occurred within five years of the termination of the conduct on which the defendant's 2002 guilty pleas were based, it concluded that the defendant's concealment of the money tolled the five-year forfeiture statute of limitations.

## C. Analysis

The defendant challenges the Court of Criminal Appeals' decision affirming the trial court's order of forfeiture of the $1,098,050 cash found on the 4571 Dugger Road property. He argues that the forfeiture of this cash was barred by the five-year statute of limitations contained in the forfeiture statute, Tenn. Code Ann. § 39-11-708(d) (2010), and also by the State's failure to provide him with notice of the seizure on the day of the seizure.

The defendant raised these arguments in a pretrial motion to dismiss the forfeiture count of the indictment and during the post-trial forfeiture hearing. The trial court acknowledged that the proof was "undisputed that the bills seized . . . were minted prior

to 2000," but stated, when ruling on the pretrial motion to dismiss, that "since the money had been dug up after so long, it is reasonable that money was either used, or going to be used, in furtherance of the now on-going drug operation." In response to these arguments at the post-trial forfeiture hearing, the trial court ruled that the cash had been "directly or indirectly[] acquired by or received in violation of the drug statutes" and was "subject to judicial forfeiture." Additionally, the trial court found that, although the defendant was not provided a notice of seizure on the day of the seizure, the notice later provided by certified mail satisfied "the requirement under [Tennessee Code Annotated section 39-11-707(b)] that 'the seizing agency or official *shall cause to be delivered* . . . notice of seizure to the . . . owner.'"

By the time the Court of Criminal Appeals addressed the defendant's challenges to the trial court's forfeiture order, it had set aside the defendant's conspiracy convictions. The intermediate appellate court noted that, "none of the [defendant's] remaining convictions . . . appear to qualify as convictions from which criminal proceeds are subject to forfeiture" and commented that, were it "concerned merely with the [defendant's] [remaining] current offenses as predicates for forfeiture, [it] would vacate the forfeiture order." However, the Court of Criminal Appeals concluded that the defendant's 2002 convictions could serve as predicates for the 2012 forfeiture, despite the five-year statute of limitations, because the cash had derived from the activities for which the defendant was convicted in 2002, and the defendant's "concealment of the proceeds from his 2002 conspiracy convictions tolled the applicable limitations period." To reach this conclusion, the Court of Criminal Appeals, as a matter of first impression, adopted and applied the doctrine of equitable tolling to the five-year forfeiture statute of limitations, even though it contains no tolling provision.

In this Court, the defendant challenges the Court of Criminal Appeals' adoption and application of the doctrine of equitable tolling to uphold the forfeiture. The State, in response, urges this Court to uphold in all respects the Court of Criminal Appeals' decision. However, having already reinstated the defendant's conspiracy convictions, we deem it unnecessary to address these arguments. As explained below, we agree with the trial court that the State satisfied its burden of establishing by a preponderance of the evidence that the cash was subject to forfeiture based on the defendant's conspiracy convictions arising from the 2012 drug trafficking activities. We also agree with the

courts below that the notice of seizure provided the defendant by certified mail satisfied statutory requirements.[13]

"Forfeiture is defined as '[t]he divestiture of property without compensation.'" State v. Sprunger, 458 S.W.3d 482, 492 (Tenn. 2015) (quoting Black's Law Dictionary 722 (9th ed. 2009) (Forfeiture)). Here, as in many cases, forfeiture proceedings are instituted along with criminal charges. Id. But forfeiture proceedings are not criminal in nature and are instead *in rem* actions—actions regarding the seized property for which forfeiture is sought. Id. Although forfeiture actions often proceed "parallel to criminal prosecutions and are 'based upon the same underlying events,' they are civil in nature." Id. (quoting United States v. Ursery, 518 U.S. 267, 274 (1996)). As a result, "[t]he State has a less onerous burden—that of proving only by a preponderance of the evidence that the property is subject to forfeiture." Stuart v. State Dep't of Safety, 963 S.W.2d 28, 33 (Tenn. 1998). The forfeiture statutes at issue in this appeal expressly provide for this lesser burden of proof. See Tenn. Code Ann. § 39-11-708(d) ("The state shall establish by a preponderance of the evidence that the property is subject to forfeiture under this part."). Additionally, because the trial judge decided this forfeiture action without the intervention of a jury, we review the trial court's findings of fact "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); see also Sprunger, 458 S.W.3d at 498 n.26. Legal conclusions are reviewed de novo with no presumption of correctness. Sprunger, 458 S.W.3d at 498. We note as well that, although the trial court held a post-trial forfeiture hearing, in determining whether the State satisfied its burden of proving the property was subject to forfeiture, the trial court was entitled to consider all "evidence already in the record." Tenn. Code Ann. § 39-11-708(d).

Forfeitures are generally disfavored by the law and policy of Tennessee, so courts typically strictly construe forfeiture statutes. Sprunger, 458 S.W.3d at 494. As for the forfeiture statutes at issue in this appeal, "[i]t is the intent of the [G]eneral [A]ssembly, consistent with due process of law, that all property acquired and accumulated as a result of criminal offenses be forfeited to the [S]tate, and that the proceeds be used to fund

---

[13] The defendant has also argued in this Court that the forfeiture count of the indictment failed to provide him with adequate notice of the grounds for forfeiture. However, this issue was not raised in the courts below and is therefore waived. Bishop, 431 S.W.3d at 43.

further law enforcement efforts in this [S]tate." Tenn. Code Ann. § 39-11-701(b). To effectuate this intent, the General Assembly has declared that

> [a]ny property, real or personal, directly or indirectly acquired by or received in violation of any statute or as an inducement to violate any statute, or any property traceable to the proceeds from the violation is subject to judicial forfeiture, and all right, title, and interest in any such property shall vest in the state upon commission of the act giving rise to forfeiture.

Tenn. Code Ann. § 39-11-703(a). Furthermore, "any property used as an instrumentality in or used in furtherance of" certain criminal offenses, including "[a] conviction for a violation of § 39-17-417(i) or (j)," "shall be subject to judicial forfeiture." Tenn. Code Ann. § 39-11-703(b). In turn, Tennessee Code Annotated section 39-17-417(a) provides, in relevant part, that it is an offense to deliver a controlled substance, sell a controlled substance, or possess a controlled substance with the intent to deliver or sell it. Tenn. Code Ann. § 39-17-417(a)(1)-(4). Marijuana is specifically listed as a controlled substance. Id. § -417(i)(13), (j)(13). In the indictment at issue here, the State alleged that the defendant's property was subject to forfeiture because it was directly or indirectly acquired by a violation of either Tennessee Code Annotated section 39-17-417, possession of a controlled substance with intent to sell it, or Tennessee Code Annotated section 39-14-903, money laundering.

We agree with the trial court that the State satisfied its burden of proving by a preponderance of the evidence that the defendant's seized cash was being "used in furtherance" of the drug trafficking operation spearheaded by Son and Mr. Medina in the spring of 2012, and "directly or indirectly acquired by or received" in violation of statutory drug offenses. The proof in the record establishes that some of the seized cash was found in the defendant's bedroom, near marijuana and an electronic scale. Additionally, the proof showed that Son was released from prison on June 23, 2011, and by no later than March 2012, Son was spearheading a major marijuana trafficking operation involving hundreds of pounds of the illegal drug. Mr. Medina testified that Son paid $675 per pound for the marijuana, used cash to pay, and paid mostly in $100 bills. The $1,000,300 found in the trunk of the Civic was in $100 bills. Mr. Medina testified that he and Son conducted their drug deals on the property where this cash was located. It is true, as the defendant points out, that the condition of the ammunition can, the issuance dates of the currency, and the condition of the rubber bands binding the currency all indicated that the money had been buried for an extended period of time prior to its seizure. However, the defendant admitted that he had placed the money in the Civic in 2011, only one year before its seizure and the same year Son was released from prison. Considered together, the proof in the record supports and does not preponderate against the trial court's finding that the State satisfied its burden of proving that the money was subject to forfeiture because it was acquired directly or indirectly in violation of statutes

or was being used in furtherance of the 2012 drug trafficking conspiracy, for which the defendant was convicted. As a result, the forfeiture action is not barred by the five-year statute of limitations, as the defendant contends, because it was charged within five years of the termination of the 2012 conduct—"the conduct giving rise to forfeiture." Tenn. Code Ann. § 39-11-708(d).

We also agree with the trial court and the Court of Criminal Appeals that the notice of seizure provided the defendant by certified mail complied with the forfeiture statute. Tennessee Code Annotated section 39-11-707(b) provides, in pertinent part, that

> [u]pon seizure of property for forfeiture under this part, the seizing agency or official shall cause to be delivered a written receipt and notice of seizure to the . . . owner . . . . The notice shall list and describe generally the property seized, the agency or official responsible for the seizure and shall state the procedure for obtaining return of the property. . . .

Tenn. Code Ann. § 39-11-707(b).

The defendant argues that the words "upon seizure of property" require the State to deliver the notice of seizure on the same day the seizure occurs. We disagree. As the State points out, the statute contains no language mandating same-day delivery of the notice of seizure. If the General Assembly had intended to impose a same-day delivery requirement, it could have done so expressly. Indeed, a temporal deadline is expressly provided in the very next subsection of this statutory provision. See Tenn. Code Ann. § 39-11-707(c) ("Upon the seizure of personal property for forfeiture, the seizing agency shall within five (5) working days, apply ex parte for a forfeiture warrant from a judge authorized to issue a search warrant.").

We reaffirm the importance of providing adequate notice of a pending forfeiture to those with an interest in the property subject to forfeiture. Redd v. Tennessee Dep't of Safety, 895 S.W.2d 332, 335 (Tenn. 1995) ("One of the essential elements of due process in the confiscation and forfeiture of private property is adequate notice to all interested parties."). We also reiterate that the State bears the burden of proving by a preponderance of the evidence that it complied with the procedural and substantive requirements established by forfeiture statutes. Sprunger, 458 S.W.3d at 499-500. We simply conclude, as did the trial court and the Court of Criminal Appeals, that the State satisfied its burden in this case. The forfeiture statute at issue here does not mandate same-day delivery of the notice of seizure. The defendant has never claimed that he did not receive the notice of seizure sent by certified mail, and this record demonstrates that the defendant had sufficient time, with the assistance of counsel, to contest the forfeiture, beginning with a pretrial motion to dismiss the forfeiture count of the indictment and continuing through the post-trial forfeiture hearing. Furthermore, here officers could not have delivered a notice on the day of the seizure listing and describing the property

seized as section 39-11-707(b) requires, because officers needed the assistance of a bank to obtain an accurate count of the large amount of cash that was seized, and the bank had closed for the day.

For all these reasons, we agree with the trial court and the Court of Criminal Appeals that the State complied with the procedural and substantive requirements of the applicable forfeiture statutes when it delivered the notice of seizure by certified mail after obtaining an accurate count of the cash that had been seized rather than on the day of seizure.[14]

## V. Conclusion

Based upon the foregoing analyses, we reverse the portion of the Court of Criminal Appeals's decision invalidating the search warrant and vacating the defendant's convictions but affirm, on different grounds, the intermediate appellate court's decision upholding the forfeiture order. We otherwise affirm and reinstate in all respects the judgment of the trial court. Costs of this appeal are taxed to the defendant, Jerry Lewis Tuttle, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[14] The officer did not accurately list the date the notice was provided, but as the courts below concluded, the record indicates that this was at most an honest mistake and in no way impeded the defendant's ability to contest the forfeiture.