IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2024

**JERMAINE NELSON BUFORD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-541    Mark J. Fishburn, Judge**

_____

**No. M2023-01710-CCA-R3-PC**
_____

In 2018, a Davidson County jury convicted the Petitioner, Jermaine Nelson Buford, of possession of .5 grams or more of cocaine with intent to sell, aggravated assault, felony evading arrest, evading arrest, vandalism of property less than $1,000, and simple possession of marijuana. The trial court sentenced the Petitioner to an effective sentence of thirty years of incarceration. The Petitioner filed a direct appeal, and this court affirmed the judgments of the trial court. *State v. Buford*, No. M2019-00402-CCA-R3-CD, 2020 WL 414558, at *1 (Tenn. Crim. App. Jan. 27, 2020), *perm. app. denied* (Tenn. June 3, 2020). The Petitioner then filed a petition for post-conviction relief, alleging the ineffective assistance of counsel. After a hearing, the post-conviction court dismissed the petition. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel by trial counsel's failure to seek the suppression of evidence from the Petitioner's cell phone. After review, we affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Nathan Cate, Nashville, Tennessee, for the Petitioner, Jermaine Nelson Buford.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Mindy J. Vinecore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Petitioner's participation in a controlled sale of cocaine and subsequent evading arrest in 2018. A Davidson County grand jury indicted the

Petitioner for the sale of .5 grams or more of cocaine, possession of .5 grams or more of cocaine with intent to sell, aggravated assault against a law enforcement officer with a deadly weapon, evading arrest with risk of death or injury, evading arrest, vandalism of property valued at $1,000 or more but less than $10,000, simple possession of marijuana, driving on a revoked driver's license, and leaving the scene of an accident. Prior to trial, the charges of sale of .5 grams or more of cocaine and of driving on a revoked driver's license were dismissed and the charge of vandalism of property was reduced to vandalism of property valued at more than $500 but less than $1,000.

## A. Trial

On direct appeal, this court summarized the evidence presented at trial as follows:

At trial, Detective Seth England of the Metropolitan Nashville Police Department ("MNPD") testified that he was assigned to the East Crime Suppression Unit on November 16, 2016. In that position, his focus was on "street to mid-level drug dealers and street-level prostitution" by initiating "undercover narcotics transactions" and performing "parking lot enforcement." On the day of the incident, Detective England approached a "street-level prostitute" about participating in a narcotics transaction as a confidential informant. The confidential informant told officers that she would participate and could arrange a transaction with "Shakey." Detective England explained that it was "more common than not" to utilize someone as a confidential informant immediately after their own arrest to "on-the-spot help you recover certain kind[s] of narcotics." According to Detective England, this particular confidential informant did not have a lengthy record, with approximately sixteen prior misdemeanors and no prior felonies. In addition, she did not appear to be under the influence of drugs. The confidential informant was "thoroughly" searched, "strip[ped] of any monetary funds, any personal cash," and given "specifically marked money."

Detective Forrest Drake, another member of the East Crime Suppression Unit, was "assigned to pre-operation surveillance" during the controlled buy. Additionally, he was tasked with assisting as a "takedown officer" who would move in as the drug transaction was completed to protect the confidential informant and take the dealer into custody. Detective Drake was told by Detective England to look for a "black SUV or a maroon four-door vehicle." When he got to the area, he saw a maroon Impala parked on the street "in between North 7th and North 8th on Evanston" with its lights on. He did not see a black SUV.

Sergeant David Layne of the MNPD was the supervisor of the East Crime Suppression Unit at the time of the incident. At trial, Sergeant Layne

- 2 -

testified as an expert in street-level narcotics. On the day of the incident, Sergeant Layne was part of the pre-surveillance team, positioned near the location where the drug transaction was to occur, on North 7th Street near Evanston. He was "parked alongside of the street, attempting to blend in."

Detective England explained that he utilized his "work" cell phone as the phone the confidential informant would utilize to set up the controlled buy. Several calls were made by the confidential informant using Detective England's phone to arrange the sale. During one of these the conversations, the confidential informant asked the person on the other end of the phone for "powder." During two additional calls to Detective England's phone from the phone number called by the confidential informant to arrange the sale, Detective England could hear the person on the other end of the phone inquire about the confidential informant's whereabouts.

Detective England drove the confidential informant to the prearranged location for the drug sale, North 8th and Evanston, and dropped her off at around 6:15 p.m. There were five members of the police unit present in the area that evening, and at least one car was positioned in a location from which the transaction could be viewed. Sergeant Layne was in this car. Detective England was not positioned in a location from which he could view the drug transaction. Instead, he was communicating via radio with other members of the police department and listening to the transaction on a recording device planted on the confidential informant.

Robert Young, who was a retired MNPD officer at the time of the trial, assisted in "close cover of the confidential informant." His undercover vehicle was positioned on North 8th so that he could "maintain a visual of the confidential informant as they approach[ed] the dealer." Officer Young watched the confidential informant walk toward Evanston and placed his car in drive in order to maintain visual contact with the confidential informant as she approached the location for the drug sale. Officer Young saw the confidential informant get into the passenger's seat of a maroon Impala. As he drove past the Impala "very slowly," he could hear "what [he] thought was the good deal signal given over the listening device."

Detective England explained that a drug transaction is normally a "very, very quick" exchange of money and drugs between the confidential informant and the drug-dealer. While listening to the actions of the confidential informant, Detective England also surmised that the transaction was completed, so the officers "moved in to perform a take-down on the maroon Impala." Officer Young, whose car was still near the Impala, placed his car in reverse so he could use his car to block the Impala from leaving the

area.  Other officers surrounded the Impala in their undercover cars, initiating their lights and sirens.  Detective Drake was driving one of these cars, and his car was positioned in front of the Impala, near Officer Young's car.  At that point, Detective Drake could not see who was in the vehicle.

Sergeant Layne "looped in towards the driver's side of [the Impala]" in his SUV.  The high beams and blue lights in the grill of his SUV were activated.  Sergeant Layne's SUV was about six feet away from the Impala.  At the time, it was dark outside, but there were streetlights in the area providing illumination.  Sergeant Layne had a direct view of the person in the driver's seat of the Impala and identified [the Petitioner] as the driver of the vehicle.

By this time, Detective England had moved his car toward the location of the sale, and "at that point the [person driving the Impala] decided to flee" with the confidential informant still inside the vehicle.  Even though Detective England was driving toward the Impala in his car from the "very back" of the pack of police vehicles, Detective England could see the "maroon Impala pull out from the curb" and attempt to drive around Detective Drake's vehicle.  Detective England watched the Impala accelerate and "ma[k]e contact with Detective Drake's car."  Detective Drake was inside his car when it was hit by the Impala.  He was scared and a little sore but did not seek medical attention.  Detective Drake's car sustained $644 in damage.  Officer Young also "braced for impact," expecting to be hit by the Impala.

The driver of the Impala did not stop the car after hitting Detective Drake's car, but accelerated again, turning into the alley to flee the area.  Officer Young turned his car around and followed the Impala.  Detective England was also able to turn his car into the alley, following the Impala with the confidential informant still inside.  Detective England recalled that the Impala was speeding "excessively fast in the alley," hitting trash cans and creating a "very hazardous situation to [the police] and [the driver] and anybody else that had been out in the area."  Officer Young recalled that the Impala was "kicking up" a lot of dust.  Detective England's car reached a speed of around 40 miles an hour to try to keep up with the Impala.  At one point, the Impala became airborne.  The chase lasted a total of about two blocks, and the Impala sped through at least one intersection without even slowing down before the vehicle eventually came to rest up against a tree.

After the Impala came to a stop, about five detectives and one sergeant were on the scene, including Detective Drake and Officer Young.  Detective England arrived at approximately 6:20 p.m.  The engine of the Impala was

still running, but [the Petitioner] was no longer inside the vehicle. Detective England and other officers thought that [the Petitioner] "bailed out [of the car] somewhere between, right before Douglas, but right . . . before the car actually crashed out." The confidential informant explained to officers that she was able to crawl over into the driver's seat to stop the vehicle.

At that point, officers surmised that they had probable cause to believe that there were narcotics inside the vehicle. Detective Drake conducted the search of the vehicle. The majority of the items were located inside the center console, which was a bit cattywampus, presumably from the collision. A wallet was found in the center console. It contained identification belonging to [the Petitioner], in addition to an expired insurance card containing [the Petitioner's] printed name and a debit or credit card with [the Petitioner's] printed name. A marijuana blunt was discovered next to the wallet. The marijuana weighed approximately one gram. Detective England also located a cell phone inside the vehicle and photographs of [the Petitioner] with his family. The keys in the car were attached to a leather lanyard with "Mr. Buford" inscribed on one side and "Mrs. Buford" inscribed on the other side.

When Detective Drake removed a loose portion of the vehicle's dashboard, he discovered a white plastic bag containing 4.2 ounces (or 119 grams) of cocaine. Detective Drake explained that usually a "[s]treet-level [sale weighed] basically a tenth of a gram up to a half of a gram and sometimes a whole gram." The cocaine discovered in the dash of the Impala was "very hard, as if it ha[d] been broken directly off of a brick." Detective Drake described the cocaine as "whiter powder than what [he was] used to," indicating that it had not been "cut." Detective Drake explained that most street-level dealers "cut" pure cocaine with another product, "typically a white powder of some kind so that they can stretch the amount that they have" to increase the amount of product by "a half or a 50-percent ratio or something along those lines." Detective Drake estimated that the street value of the cocaine recovered from the car was $12,000 before it was cut and approximately $24,000 if it was cut with another powder.

Once the Impala was stopped and officers conducted the search, Detective England initiated a call at 6:20 p.m. and again at 6:49 p.m. from his cell phone to the number used by the confidential informant to arrange the drug transaction. Both of these calls rang the telephone found inside the Impala during the search. Detective England later secured a search warrant for the cell phone found in the vehicle. Detective England delivered the cell phone to Detective Chris Brennan for analysis. Detective Brennan used a service called Cellebrite to extract information from the cell phone. This information was given to Detective England on a zip drive, and the cell phone

was returned to the property room. An examination of the call log from the cell phone found in the vehicle indicated that the phone received an incoming call from Detective England's cell phone at 6:06 p.m. on November 16. The call log indicated that the call was not answered. The cell phone received another call from Detective England's cell phone at 6:08 p.m. Detective England's testimony indicated that this call was initiated by the confidential informant, answered by the person holding the cell phone found in the Impala, and lasted for approximately one minute and thirty-eight seconds. Detective England's phone received an incoming call from the phone number of the cell phone found in the Impala at 6:10 p.m. This call was also answered by the confidential informant and lasted for forty-four seconds. Detective England's phone received another call from the phone found in the Impala at 6:14 p.m. This call was answered by the confidential informant and lasted approximately twenty-six seconds.

The cell phone found in the Impala also made several calls to and received several calls from Evonnae Buford's cell phone number on the day of the incident. Mrs. Buford was [the Petitioner's] wife and the owner of the Impala. Additionally, the cell phone found in the Impala contained at least one picture of [the Petitioner's] daughter and a video of [the Petitioner] and Mrs. Buford. These items were sent to the cell phone found in the Impala from Mrs. Buford's cell phone.

According to Detective England, the call log from the cell phone found in the Impala showed calls made to contacts in the cell phone with names like "My dog," "Cuz dirty," "Drew," and "Joe." Mrs. Buford's telephone number appeared in the call log but her name was not labeled in the contacts of the cell phone. However, Detective England explained that it was not unusual for "drug dealers" to refrain from placing information about their family on their "drug phone."

Sergeant Layne reviewed several text messages from the cell phone found in the Impala. One of the text messages stated, "I need a 15." Three additional text messages stated, "I got 64 ball"; "I need a 20"; and "half a g." Other text messages referenced meeting locations and times. Sergeant Layne testified that the text messages contained "slang" for "a possible drug meeting or someone looking to purchase narcotics."

Detective Drake denied being responsible for the confidential informant and did not know the whereabouts of confidential informant at the time of trial. Detective Drake explained that he was not the detective assigned to the confidential informant. Detective England, on the other hand, admitted that he was responsible for the confidential informant during the

incident. He knew the identity of the informant but did not know her whereabouts at the time of trial. Detective England had a telephone number for the informant but was unable to reach her prior to trial. He "looked on and off for her for probably a month" prior to trial by calling her and visiting several addresses listed in her contact information. He also put out an alert on the "RMS System," so if the confidential informant was stopped by the police, Detective England would have been notified. Detective England admitted that he could not locate the confidential informant.

Mrs. Buford testified on behalf of [the Petitioner] at trial. On the day of the incident, she drove her Impala with darkly tinted windows to the "orange" store near Douglas Avenue. It was around 5:30 p.m., and she was accompanied by her six-year-old son. When she got to the market, she left her car running while she and her son went in to the store to buy a few snacks for her son. When she came out of the store, she "thought somebody was playing a joke on [her] because [the Impala] was gone." Mrs. Buford explained that she spent "about 10 to 15 minutes" looking for her phone and could not call anyone because her son had been playing on the phone and the phone was "dead." She borrowed a charger from someone and charged her phone for a few minutes so that she could call her mother. After Mrs. Buford called her mother, she called the police. She waited a few minutes for the police, but it was "cold and raining," so she walked with her son to her father's house nearby. Mrs. Buford explained that it took 20 to 25 minutes to walk to her father's house but later admitted that it was only approximately three blocks and could not explain why it took that long to walk that distance. The police eventually came to her father's house. According to Mrs. Buford, the officer indicated that it was [the Petitioner] who had her Impala. The officer reminded her that it was a crime to make a false report. Mrs. Buford told the officer that if [the Petitioner] stole her car, she wanted to prosecute him. According to Mrs. Buford, the officer accused her of lying and told her that a detective would have to take the report. Mrs. Buford claimed that a detective never called her about making a report but that she was at some point "served with a warrant that [she] was lying."

Mrs. Buford identified the wallet that was found in the Impala and confirmed that it belonged to [the Petitioner] but explained that it was an old wallet. Mrs. Buford also identified the keychain found in the Impala and admitted that it was hers. When asked to identify the cell phone found in her Impala, Mrs. Buford claimed that she did not recognize the phone. She admitted that the call log reflected that she sent text messages to the phone found in the car from her cell phone, including one that stated, "pull-ups and Krystal, a fry, double-cheese Krystal and some honey barbecue boneless wings, fresh fries, you don't have to come yet, they open 24 hours," but she

could not recall if she sent the text to [the Petitioner]. Mrs. Buford was questioned about several text messages from her cell phone to the phone found in the Impala. However, when confronted with each one of these text messages, Mrs. Buford could not definitively say that she sent the text messages to [the Petitioner]. Mrs. Buford admitted that the call log from the phone found in the Impala contained several telephone calls from her cell phone to that phone on the day of the incident. Mrs. Buford claimed that she did not remember who she talked to or if she was even the person that made the calls.

[The Petitioner] submitted evidence of an alibi at trial. Richard Leyba, an employee of Style and Glo auto body repair shop, testified that [the Petitioner] was working at the shop on the day of the incident. Specifically, [the Petitioner] came to work that morning around 8:00 or 9:00 a.m. and left around 5:00 or 6:00 p.m. He identified a hand-written time sheet from November 16, 2016, that reflected [the Petitioner] worked from 9:23 a.m. to 7:20 p.m. He recalled working with [the Petitioner] that day. Mr. Leyba admitted that he had two prior convictions for theft from 2013.

Earl Havey Jaynes, the owner of Style and Glo Auto Repair, testified that he "[v]aguely" recalled the day of the incident. He explained that if the time sheet "said [the Petitioner worked on November 16] or if [Mr. Jaynes] initialed it, then [the Petitioner] did." Mr. Jaynes explained that he was not able to provide any additional documents reflecting that [the Petitioner] worked on the day of the incident or that [the Petitioner] was even an employee of the shop because the business had moved to a different location and paperwork was "in boxes." He recalled that [the Petitioner] filled out a W-9 and thought that he "probably" had a copy of the document but was not sure of its location.

In rebuttal, the State called Detective Drake, who explained that when a car is reported stolen by a spouse, the police department is unable to process it as a stolen car because it is "considered shared property." Detective Drake also explained that it was not raining but was clear on the day of the incident. Additionally, Steve Turner of the District Attorney's Office testified that he visited the Shine and Glo Auto Repair shop and asked for paperwork like W-2s, W-9s, W-4s, or more time sheets that would reflect [the Petitioner's] employment. Initially, Mr. Jaynes told Mr. Turner that he had the paperwork. When Mr. Turner returned to retrieve the paperwork, Mr. Jaynes said that he could not find the documents. The State recalled Detective Brennan to testify that he was able to locate an email account associated with the cell phone.

The account was identified as McDowellJemesia@gmail.com.[1] Additionally, Detective Brennan testified that cell tower location information indicated that at 2:09 p.m. and 2:10 p.m., the cell phone found in the Impala was not near Style and Glo Auto Repair Shop but was actually located closer to the market from which Mrs. Buford's car was "stolen."

*Buford*, 2020 WL 414558, at *1-6. The jury acquitted the Petitioner of the charge of leaving the scene of an accident but otherwise convicted the Petitioner as charged.

The Petitioner appealed, and a panel of this court affirmed his convictions. *Id.* at *1, *10. After our supreme court denied review on June 3, 2020, the Petitioner filed a timely pro se petition for post-conviction relief, alleging the ineffective assistance of counsel based on trial counsel's "failure to file a motion to suppress" evidence from a "warrantless," "unlawful search" of the Petitioner's cell phone.[2] After the post-conviction court appointed post-conviction counsel, the Petitioner filed an amended petition on July 28, 2022.

## B. Post-Conviction Hearing

Prior to the Petitioner's January 5, 2023 post-conviction hearing, the Petitioner informed the post-conviction court that he had recently received a copy of the search warrant for his cell phone from the State. The post-conviction court permitted the Petitioner to orally amend his post-conviction petition to argue that trial counsel should have filed a motion to suppress the search of the Petitioner's cell phone because the affidavit failed to establish sufficient probable cause to support the issuance of a search warrant.

Trial counsel testified that he represented the Petitioner throughout his trial and summarized the events giving rise to the Petitioner's arrest. Trial counsel recounted his presentation of an alibi defense in which he argued that the Petitioner had been "at work at the time" of the charged offenses. He also recalled that he argued that the Impala had been stolen from Mrs. Buford immediately prior to the charged offenses after she exited the vehicle and "left the keys in the car." He attempted to impeach Sergeant Layne's trial testimony that he had seen the Petitioner driving the Impala, by arguing that the night had been raining and dark, and also by noting that Sergeant Layne had only briefly been able to see the Petitioner and was unable to recall whether the Impala's windows had been tinted. He also posited that the Petitioner's cell phone, wallet, and keychain were present in the vehicle because "[i]t was his wife's car."

Trial counsel testified that roughly fifteen of the State's trial exhibits had been

---

[1]  Mrs. Buford identified Jemesia Buford as the name of one of her children.
[2]  The Petitioner presented several other claims of ineffective assistance of counsel in his petition which are not raised on appeal.

recovered from a data extraction performed on the Petitioner's cell phone, which was recovered from "inside the console between the driver's seat and the passenger's seat" of the Impala. Trial counsel stated that these exhibits significantly helped the State identify the Petitioner as the driver of the Impala. He recalled that the Petitioner was not arrested immediately and was instead apprehended several days after the incident. Trial counsel did not believe that a cell phone was seized from the Petitioner when he was arrested.

The affidavit in support of the search warrant for the Petitioner's cell phone was introduced through trial counsel's testimony. In this affidavit, Detective England wrote the following:

On [November 16, 2016,] at approximately 1800 hours East CSU were conducting a buy/takedown operation utilizing a confidential informant [henceforth] referred to as CI. The transaction was to take place from a subject known as Shak[e]y. The CI placed a control[led] call to the subject and placed an order for cocaine. The CI was searched and stripped of all money prior to the transaction. Prior to the CI meeting Shak[e]y, Det. Drake conducted pre-surveillance on N[orth] 8th Street near Evanston Street around 1810 [h]ours and observed a Maroon Chevrolet Impala . . . parked in the curve, which was the area that the drug deal was supposed to occur. Det. England drove the CI to the deal and she approached the subject and got into the passenger seat of a maroon Chevy Impala. The CI was also observed by Det. Young getting into the passenger seat of the Maroon Chevrolet Impala . . . at approximately 1818 [hours]. The CI was equipped with an electronic listening device and when she gave the signal that the narcotics transaction occurred, Police moved in to perform the takedown and place the subject into custody. Police had their emergency equipment including blue lights and sirens to identify ourselves as the police. When the subject saw police trying to take him into custody[,] he intentionally struck Det. Drake's police vehicle with his Impala. He was able to push Det. Drake's vehicle out of the way and drove down the alley at a high rate of speed. The impact to Det. Drake's vehicle was significant. The subject then continued to flee from the police at a high rate of speed down the alley towards Douglas Ave. and Jones Ave. The subject struck several trash cans and kept going. When the subject got to Douglas Ave.[,] he abandoned the vehicle and fled the scene on foot. A [s]earch of the subject's vehicle yielded 4.2 ounces of powder cocaine from inside the dash of the Impala. The cocaine was field test[ed] and field tested positive by Det. Drake. Det. England located the subject's wallet from the center console of the vehicle. Inside the wallet was a Tennessee [d]river's license that is revoked through the state of Tennessee. The I[D] belonged to [the Petitioner]. Sgt. Layne was able to get a look at the subject driving the vehicle. Sgt. Layne stated that he was sure that [the Petitioner] was the one driving the vehicle. Det. England's CI identified him as well. There was

- 10 -

also [a] marijuana blunt in the center console of the vehicle. The transaction took place at the [intersection] of Evanston and N[orth] 8th. [This location] is within 1000 feet of [F]un in the [S]un day care.

Based on the experience of this Affiant[,] the sell, manufacture, and delivery of illegal narcotics is facilitated by the use[] of portable electronic communications such as the cell phones located with [the Petitioner]. . . . The information gathered within these cellular devices may assist in investigating ongoing criminal activity and m[a]y provide information related to current investigations.

The affidavit described the cell phone to be searched as a "black and blue Kyocera cell phone" belonging to the Petitioner and listed its "DEC," "HEX," and model numbers. The affidavit concluded with several paragraphs of boilerplate language regarding Detective England's qualifications and experience.

Trial counsel testified that he did not obtain a copy of the search warrant for the Petitioner's cell phone and averred that he had "never seen this document before." He stated that he would have filed a motion to suppress the search if he had been able to review the search warrant prior to trial because he did not believe that the affidavit supported a finding of probable cause. He did not recall why he did not attempt to procure a copy of the search warrant and denied that he strategically neglected to do so. Trial counsel also did not recall whether he sought the suppression of the text messages recovered from the data extraction of the Petitioner's cell phone.

On cross-examination, trial counsel testified that he filed several motions during the Petitioner's trial and that he met with the Petitioner "on a regular basis" prior to trial and "at least three or four times" during the week before trial. Trial counsel did not recall whether he reviewed the State's discovery file. He recalled arguing that the Petitioner did not send the text messages which were recovered from the Petitioner's cell phone.

On redirect examination, trial counsel testified that it was his "understanding" that the cell phone recovered from the Impala was not functional and had not been used in "some time" and that the driver's license was "old." He agreed that a successful motion to suppress the evidence recovered from the Petitioner's cell phone would "absolutely" have strengthened his defense of the Petitioner and stated that he would have filed such a motion if he believed it would have been successful.

The Petitioner testified that he believed the State's introduction of evidence recovered from his cell phone "hurt" his case and damaged the credibility of his alibi defense. He stated that he was unaware that evidence would be presented from his cell phone until trial and that if he had known such evidence could have been excluded, he would have requested that trial counsel file a motion to suppress. He estimated that he met

with trial counsel approximately ten times and that they discussed some, but not all, of the discovery materials.

The post-conviction court then heard closing arguments. The Petitioner argued that the affidavit in support of the search warrant failed to establish probable cause because it "neglects to mention that [the] investigation in any way connects to a phone." He asserted that the State's case relied heavily on the evidence recovered from his cell phone and that without it the jury would have had only Sergeant Layne's brief glimpse of the Petitioner driving the Impala as identification evidence. He argued that the presence of the Petitioner's personal effects in the Impala were consistent with his theory that the vehicle had been stolen.

The State responded that the Petitioner had failed to establish trial counsel's failure to seek the suppression of the Petitioner's cell phone was prejudicial. The State argued that a motion to suppress would not have been successful, but even if it had, ample evidence still supported Sergeant Layne's identification of the Petitioner as the driver of the Impala. The State asserted that the recovery of the Petitioner's wallet, driver's license, and cell phone shortly after the Petitioner exited the Impala helped to prove his ownership of and presence in the vehicle. Further, the State argued that each witness who testified in favor of the Petitioner's alibi defense had been impeached.

The post-conviction court denied relief and dismissed the Petitioner's petition on November 16, 2023. In its written order, the post-conviction court credited trial counsel's testimony that he would have filed a motion to suppress evidence from the Petitioner's cell phone if he had known of the search warrant's existence prior to trial. Though the post-conviction court remarked that trial counsel's failure "to know of the existence of the search warrant before trial begs the question if he was deficient in pursuing discovery and properly investigating in the first place," the post-conviction court nevertheless found that the Petitioner had failed to prove prejudice. The post-conviction court found that in the absence of evidence from the Petitioner's cell phone, the State's proof would have still included "the identification of the Petitioner by a detective," the presence of "the Petitioner's phone, wallet, driver's license identification, and family photos" in the vehicle, and the Petitioner's wife's ownership of the vehicle. Accordingly, the post-conviction court held that the evidence was "sufficient to conclude that there is not a reasonable probability that the outcome would have been different" in the event of a successful motion to suppress. The Petitioner timely appealed.

## II. Analysis

On appeal, the Petitioner argues that he received the ineffective assistance of counsel by trial counsel's failure to challenge the warrant authorizing the search of the Petitioner's cell phone. He contends that trial counsel was deficient in failing "to obtain all discovery in this case" and by failing to learn of the search warrant's existence. Further,

- 12 -

the Petitioner posits that if trial counsel believed that no warrant existed to authorize the search of the Petitioner's cell phone, then trial counsel should have nevertheless challenged it as an illegal and warrantless search. He maintains that a motion to suppress would have been successful and that the exclusion of the evidence recovered from the cell phone would have led to a different outcome. The State responds that the post-conviction court appropriately denied relief.

A criminal defendant's right to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffective assistance of counsel:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given, or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note

that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Tennessee Supreme Court has recently held that when a petitioner raises an ineffective assistance of counsel claim based on counsel's failure to file a motion to suppress, *Kimmelman v. Morrison*, 477 U.S. 365 (1986), defines the proper standard for prejudice. *Phillips v. State*, 647 S.W.3d 389, 404 (Tenn. 2022). Under *Kimmelman*, a petitioner must show a meritorious suppression claim and a reasonable probability that the outcome of the proceedings would have been different had the evidence at issue been excluded. *Id*. Additionally, consistent with the *Strickland* deficiency prong, counsel's failure to file the motion must have been objectively unreasonable. *Id*. Therefore, when a petitioner asserts that trial counsel failed to file a motion to suppress, the petitioner must show "(1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Id*. (citations omitted). Under the *Kimmelman* test, the burden to prove the factual allegations supporting the petitioner's claims by clear and convincing evidence remains with the petitioner. *Id*. (citing T.C.A. § 40-30-110(f)). Thus, in order to prevail, the petitioner "should incorporate a motion to suppress within the proof presented at the post-conviction hearing." *Id*. at 403 (quoting *Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011)).

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides as follows:

- 14 -

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, will not be violated, and no warrants will issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Similarly, article I, section 7 of the Tennessee Constitution provides:

[P]eople shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and not to be granted.

Tenn. Const. art. I, § 7.

"[A] search warrant shall be issued only on the basis of an affidavit, sworn before a 'neutral and detached' magistrate, which establishes probable cause for its issuance." *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999). To establish probable cause, the affidavit must demonstrate a "nexus among the criminal activity, the place to be searched, and the items to be seized." *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002)). In determining whether the nexus has been sufficiently established, courts should consider "'whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" *Id.* (quoting *Reid*, 91 S.W.3d at 275). When the affidavit contains no direct evidence of such a nexus, "we must . . . determine whether it was reasonable for the magistrate to infer that the items of contraband listed in [the] affidavit would be located" in the place to be searched. *Saine*, 297 S.W.3d at 206. "[U]nlike an affidavit in support of an arrest warrant, an affidavit seeking issuance of a search warrant need not implicate a particular person in the crime under investigation." *State v. Tuttle*, 515 S.W.3d 282, 301 (Tenn. 2017) (citations omitted).

The Petitioner maintains that trial counsel's failure to know of the search warrant's existence or to challenge the search of the Petitioner's cell phone constituted deficient performance and that this deficient performance prejudiced him because it allowed the State to introduce harmful evidence which bolstered Sergeant Layne's identification testimony. Without this evidence, he contends that the State's case would have been much weaker and that this, coupled with his alibi defense, would have made it impossible for a reasonable jury to convict the Petitioner.

We agree with the post-conviction court that trial counsel's failure to discover the existence of a search warrant calls into question his diligence in investigating the case. However, the evidence does not preponderate against the post-conviction court's conclusions that this failure did not prejudice the Petitioner. To be sure, the introduction of identification evidence recovered from the Petitioner's cell phone helped the State prosecute its case, but even in its absence, ample identification evidence was introduced upon which a reasonable jury could have relied in convicting the Petitioner. Sergeant Layne testified that he had a direct view of the person in the driver's seat of the impala and identified him as the Petitioner. Though the Petitioner attempted to impeach Sergeant Layne's ability to clearly see the Petitioner through Mrs. Buford's testimony that it was raining, Detective Drake testified in rebuttal that it had not been raining. Additionally, the witnesses the Petitioner presented in support of his alibi defense were each impeached. Mr. Leyba testified that he worked with the Petitioner at Style and Glo Auto Repair and introduced a handwritten timesheet purporting to show that the Petitioner worked from 9:23 a.m. to 7:20 p.m., but Mr. Jaynes, the business's owner, was unable to provide any documentation that he had ever employed the Petitioner. This proof, along with the recovery of the Petitioner's wallet, driver's license, cell phone, and family photos from the Impala used in the commission of the charged offenses, supported the jury's conviction.

We conclude that the Petitioner failed to establish "a reasonable probability that the verdict would have been different" absent the evidence obtained from his cell phone. *Phillips*, 647 S.W.3d at 404. Accordingly, the Petitioner is not entitled to post-conviction relief.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

- 16 -